# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-02328-SCT

*MALIKAH GLOVER, BY AND THROUGH HER
PARENTS AND NEXT OF KIN, GREGUICK
GLOVER AND SANDRA GLOVER*

*v.*

*JACKSON STATE UNIVERSITY*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 09/23/2005 |
| TRIAL JUDGE: | HON. BOBBY BURT DELAUGHTER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT FARLEY WILKINS |
| | BARRY W. HOWARD |
| | JENNIFER PAIGE WILKINS |
| ATTORNEYS FOR APPELLEE: | BARRY DOUGLAS HASSELL |
| | MICHAEL WAYNE BAXTER |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND REMANDED - 12/06/2007 |
| MOTION FOR REHEARING FILED: | 08/30/2007 |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     The motion for rehearing is denied. The original opinions are withdrawn, and these opinions are substituted therefor.

¶2.     This fourteen-year-old case has a curious and interesting history which will not end with today's decision.  The matter presented for review is a summary judgment granted to Jackson State University ("JSU") in a suit for damages caused to a fourteen-year-old girl who

was raped by two fifteen-year-old boys on JSU's campus. The issue presented and briefed by the parties is whether JSU bears any legal responsibility for the rapes.

## FACTUAL BACKGROUND

¶3.     The National Youth Sports Program ("NYSP") was established in 1969 for the purpose of providing sports programs for economically disadvantaged children across the United States. The NYSP operates under the auspices of the National Collegiate Athletic Association to administer federal funding and provide guidelines to 160 institutions of higher education which, in turn, host and operate the programs.

¶4.     For several years up to and including 1993, JSU hosted, staffed, and operated a NYSP program on its campus. JSU employee L. V. Donnell served as Activity Director of the 1993 NYSP program at JSU. Lohorace Cannada and Chris Chase, both fifteen years old, had participated in the program at JSU for several years. Both boys had been involved in numerous fights on the NYSP bus and on the JSU campus.[1] In 1992, Cannada was expelled from the NYSP program because of his fighting. Chase also had been involved in numerous fights, prompting the staff to threaten to expel him from the program.

¶5.     The NYSP bus was leased to JSU by C.H. Epps, and was driven by the driver for the NYSP program, Douglas Luster, who picked up the children each day. Luster also worked in the NYSP program on the JSU campus as a Senior Aide. Luster testified that he was aware of the two boys' violent history. He also testified that his most important job was to supervise the children in the NYSP program. JSU had instructed that, once the children got

---

[1] The trial court characterized this violence as "adolescent horseplay." This descriptive term seems hardly consistent with the court's duty – when considering a summary judgment motion – to view the facts in the light most favorable to the non-moving party.

on the bus, he was responsible for delivering the children to JSU, and that the program was responsible for the children from the time they boarded the bus.

¶6. On Monday, June 14, 1993, the children were assembled in the Athletic and Assembly Center ("AAC") on the JSU campus. One of the boys approached Luster to inform him that a girl was in the boys' restroom. Luster went to the hallway outside the restroom and found fourteen-year-old Malikah Glover and another girl standing outside the boys' restroom. When both girls denied being in the boys' restroom, Luster ordered everyone to clear the hallway, but conducted no further investigation, even though the boy who had reported the incident continued to insist that the girls were not telling the truth. Cannada[2] was later to testify that he and Glover had, in fact, been in the boys' bathroom having sex on that occasion.

¶7. Cannada testified that, at around 7:00 a.m. on the morning of Friday, June 18, 1993, the bus (with Luster driving) picked him up in front of his house to take him to the program. Chase and Glover were on the bus. Cannada stood next to Luster, and they talked as he drove the bus to the JSU campus. In addition to Luster's knowledge that both Cannada and Chase had a violent history, the record also reflects that, during the ten months preceding the rape, sixty-three crimes were reported to have occurred on the JSU campus, twenty-one of which were violent crimes and four of which were rape and sexual battery.

¶8. According to Cannada, Luster arrived on campus with the children around 7:30 a.m. and dropped them off at the AAC building, where the boys' restroom incident had occurred

_____

[2]Cannada is one of the two boys who later pleaded guilty to raping Glover on the Friday following the incident in the boys' bathroom, leading to this lawsuit.

3

on the previous Monday. However, upon learning that he had dropped the children off at the wrong building, he told them to get back on the bus. Luster did not notice that Glover, Cannada, and Chase did not get back on the bus. Leaving the three children behind unattended and unsupervised, Luster drove away, taking the other children to the old gym, where the children were supposed to be. Soon thereafter, Cannada and Chase took Glover into a building and raped her. After Glover reported the rape, Cannada and Chase were arrested, and both boys pleaded guilty.

¶9. Notwithstanding that its own bus driver had left the three children on campus, unattended and unsupervised, JSU informed parents by letter dated June 21, 1993, (three days after the rape occurred) that they should not drop off their children on the JSU campus before 10:30 a.m. because JSU had no supervision or security prior to that time. Furthermore, the NCAA informed JSU by letter dated June 28, 1993, that it was in violation of federal guidelines with respect to proper staffing of the NYSP program at JSU.

## PROCEDURAL HISTORY

¶10. The procedural history of this case was set forth in meticulous detail seven years ago in Presiding Justice Waller's majority opinion in **Glover v. Jackson State Univ.**, 755 So. 2d 395 (Miss. 2000) ("**Glover I**"). Glover filed suit against numerous defendants, including Epps, Luster, and JSU. All the defendants have been dismissed by summary judgment and collateral estoppel, with the exception of JSU,[3] and this Court reversed the summary judgment granted to JSU, and remanded to the trial court

---

[3] *See* **Glover I,** 755 So. 2d at 404-05.

4

for a determination of the liability of JSU, such liability being contingent upon whether JSU had in effect a policy of liability insurance which would cover a tort suit for Glover's injuries.

*Id*. at 404-05.  In reaching its conclusion, the ***Glover I*** majority noted that Glover's injuries

occurred on June 18, 1993, prior to the waiver of sovereign immunity for the state and its political subdivisions.  The Tort Claims Act took effect in April, 1993, but immunity was not waived for the state until July 1, 1993.  Therefore, this case is governed by ***Gressett v. Newton Separate Mun. Sch. Dist***., 697 So. 2d 444 (Miss. 1997).  In ***Gressett***, this Court held that a school district was immune from suit in a tort that arose after the April 1993 date of the Mississippi Tort Claims Act, but before immunity was waived for the state's political subdivisions on October 1, 1993.  *Id*. at 446.

However, our holding in ***Gressett*** is tempered by the recent decision in ***Lincoln County Sch. Dist. v. Doe,*** 749 So. 2d 943 (Miss. 1999), where we held that, pursuant to § 11-46-16(2) of the Tort Claims Act, a governmental entity which has in effect a policy of liability insurance which covers the tort sued upon will waive immunity to the extent of the liability coverage.

755 So. 2d at 400.

¶11.   In briefing ***Glover I***, JSU did not deny that a policy of liability insurance was in force, but rather argued that the policy "was not provided for or approved by the Board of Trustees of State Institutions of Higher Learning," but that it "was provided by the National Youth Sports Program as part of the agreement between it and JSU."  *Id*. at 401.  This Court rejected JSU's argument, finding that such approval was not required for the waiver of immunity provided under Section 11-46-16(2) of the Mississippi Code. *Id*.  The ***Glover I*** Court then pointed out that "the issue of whether the insurance policy in dispute would cover Glover's injuries was not addressed by the trial court and, therefore, [was] not properly before this Court . . . ."  *Id*.  Thus, we remanded "to the trial court for such a determination."  *Id*.

5

¶12.    With respect to the suit against Luster and Epps, the **Glover I** majority noted:

> Before Glover's third complaint was filed, Epps' liability insurance carrier, National Fire & Marine Insurance Company, filed a declaratory judgment action (Civil Action No. 3:96cv176BN) in the United States District Court for the Southern District of Mississippi, Jackson Division, against Epps d/b/a Ace Rental Service, Luster and Glover. National Fire claimed that its policy did not provide coverage to Epps for the payment or defense of Glover's claims in state court. United States District Judge William H. Barbour, Jr., granted National Fire's motion for summary judgment, ruling that National Fire was not liable to Glover and had no duty to defend Epps and Luster in the state actions. Judge Barbour stated, "Glover has submitted no evidence that the bus driver could have foreseen that the male students on the bus would rape Glover when he transported the youths to the wrong location. In the present case, the Court finds that no jury could reasonably find that the intervening criminal act was foreseeable." *National Fire & Marine Ins. Co. v. Epps, et al.,* No. 3:96cv176BN (S.D.Miss.), aff'd mem., 127 F.3d 35 (5th Cir. 1997). After the federal court made the ruling, Epps and Luster added res judicata and/or collateral estoppel claims to their motions for summary judgment pending in state court. Judge Hilburn granted all the defendants' motions for summary judgment, from which ruling Glover appeals. Judge Hilburn denied the motion to change the dismissal of the consolidated cases to one with prejudice and/or award attorney fees, from which ruling defendants appeal. The cases were consolidated on appeal to this Court.

**Glover I**, 755 So. 2d at 397-98. Because of the federal court's decision, the **Glover I** majority held that this Court was collaterally estopped from allowing the case to go to trial against Epps and Luster.

¶13.    The remand in **Glover I** was handed down on January 27, 2000. We are not told what transpired over the next five years, but on July 8, 2005, JSU filed a new motion for summary judgment which failed to address this Court's instruction in **Glover I** regarding liability insurance coverage. JSU's motion presented to the trial court deals with only the issues of proximate cause and foreseeability.

6

¶14.    We find it curious that, seven years after the remand opinion was handed down, the single issue this Court presented in *Glover I* for determination ("whether the insurance policy in dispute would cover Glover's injuries") remains unaddressed.[4]  This is particularly so since the opinion in *Glover I* was attached to JSU's motion for summary judgment.

¶15.    The trial court granted summary judgment to JSU, holding that (1) Glover's injuries were not foreseeable;  (2) JSU was not the proximate cause of Glover's injuries;  and (3) the boys' actions were superceding, intervening causes, thereby releasing JSU from liability for its negligence.  On appeal, Glover asserts only one error: that the trial court erred in granting summary judgment for JSU.

¶16.    Although we are today (for reasons unrelated to liability insurance) reversing the trial court's grant of summary judgment on the issues presented, and remanding this matter for trial, the issue of whether Glover's injuries were covered under the liability insurance policy, so as to waive its immunity, remains unresolved.  As clearly indicated by this Court's decision in *Glover I*, should it be determined that Glover's injuries were not covered by the policy, this appeal – including the judicial resources at the trial and appellate levels and the attorney fees expended – was pointless and unnecessary.

---

[4]At the hearing on JSU's summary judgment motion, JSU's counsel correctly informed the trial court that this Court remanded the case on the issue of immunity and "whether or not the insurance kept them in."  Having made this statement, however, JSU's counsel made no further reference to the issue.  Glover's counsel told the trial court that the case was sent back by the Supreme Court to be tried on the issue of liability, with no mention of the required determination of insurance coverage.

## ANALYSIS

¶17.  The only issue presented is whether the trial court erred in granting summary judgment to JSU.  Thus, we begin our analysis with a review of the rules which govern summary judgment and a discussion of the standard for reversal of a trial court's grant of summary judgment.

## I.

¶18.  Whatever doubt exists as to the appropriate application of summary judgment in a particular case, the necessity for (and wisdom of) a rule allowing early resolution of meritless cases is almost universally admitted.  Summary judgment in Mississippi is governed by Rule 56 of the Mississippi Rules of Civil Procedure, which clearly and unambiguously provides that summary judgment "<u>shall</u> be rendered forthwith . . . [if] there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c) (emphasis added).   In ***Simmons v. Thompson Machine of Mississippi., Inc.***, this Court held:

> Of importance here is the language of the rule authorizing summary judgment "where there is no genuine issue of material fact." The presence of fact issues in the record does not per se entitle a party to avoid summary judgment. The court must be convinced that the factual issue is a material one, one that matters in an outcome determinative sense . . . the existence of a hundred contested issues of fact will not thwart summary judgment where there is no genuine dispute regarding the material issues of fact.

***Simmons***, 631 So. 2d 798, 801 (Miss.1994) (emphasis omitted) (citing ***Shaw v. Burchfield***, 481 So. 2d 247, 252 (Miss. 1985)).

¶19.  If one is to faithfully apply the Rule's requirements to a particular case, the inescapable conclusion follows that the court <u>must</u> grant summary judgment unless – as to

8

each material issue of disputed fact[5] raised by the moving party – the record[6] demonstrates at least the minimum quantum of evidence sufficient to justify a determination in favor of the non-moving party by a reasonable juror.

¶20.    It is not enough to say (as many do) that summary judgment should be denied because evidence will, or might, be developed later in discovery – or at trial.  It also is not enough to say that summary judgment should be granted because the evidence is slim and unpersuasive.

¶21.    Thus, in today's appeal, we look only to learn whether, as to each issue raised by JSU, there exists a factual question to be determined by the finder of fact.[7]  Because the trial judge who granted summary judgment will also sit as the finder of fact, it is important to distinguish the trial judge's duty in reviewing the summary judgment motion from his duty as the trier of fact.

¶22.    Pursuant to an Order of this Court, Rule 56 went into effect in substantially its current form on January 1, 1981.  Two years later, writing for a unanimous Court at its "first opportunity to consider the office of the motion for summary judgment under Rule 56 . . . ," Justice Robertson provided an excellent and often-cited analysis.  ***Brown v. Credit Center,***

---

[5]We often hear parties argue that summary judgment should be defeated where there is a genuine issue as to an *important* fact.  This is not so.  There may exist many important factual issues, the resolution of which will not determine the prevailing party.  A genuine issue as to a *material* fact is one which, absent its resolution at trial in favor of the non-moving party, will result in a judgment for the moving party.  *See* ***Simmons,*** 631 So. 2d at 801.

[6]Although Rule 56(c) provides that such record evidence may include the "pleadings, depositions, answers to interrogatories and admissions on file, together with . . . affidavits," a party defending summary judgment "may not rest upon the mere allegations or denials of his [or her] pleadings."  Miss. R. Civ. P. 56(e).

[7]Ordinarily the "finder of fact" would be a jury but, as is true in this case, the trial judge, in addition to applying the law, often sits as the fact-finder.  All cases filed under the Mississippi Tort Claims Act must be tried to a judge without a jury.  Miss. Code Ann. § 11-46-13(1) (Rev. 2002).

9

*Inc.*, 444 So. 2d 358, 360 (Miss. 1983). "The argument that there exists no genuine triable issue of material fact is the functional equivalent of a request for a peremptory instruction." *Id*. at 362. The trial judge must review the matters properly presented "in the light most favorable to the party against whom the motion has been made." *Id*. Furthermore, courts

> must be sensitive to the notion that summary judgment may never be granted in derogation of a party's constitutional right to trial by jury. Miss. Const. art. 3, § 31 (1890). On the other hand, there is no violation of the right of trial by jury when judgment is entered summarily in cases where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. There is no right to trial by jury in such cases.

*Id*. Furthermore, "[w]hen doubt exists whether there is a fact issue, the non-moving party gets its benefit." *Id*. And finally, the *Brown* Court cited with approval a "leading commentary on Federal Rule 56:"

> If there is to be error at the trial level it should be in denying summary judgment and in favor of a full live trial. And the problem of overcrowded calendars is not to be solved by summary disposition of issues of fact fairly presented in an action. 6 Moore's Federal Practice § 56-15[1-2] p. 56-435 (1982).

*Id*. at 363.

¶23. In granting summary judgment to JSU, the trial court correctly held that "[t]he central question before the [trial court] at this stage of the proceedings is whether the plaintiff has brought forward any fact or evidence upon which the trier of fact could legitimately find that her alleged rape was foreseeable by JSU officials." It is firmly established in our jurisprudence that we review de novo a trial court's grant of summary judgment. *See e.g. Nygaard v. Getty Oil Co.*, 918 So. 2d 1237, 1240 (Miss. 2005); *Leffler v. Sharp*, 891 So. 2d 152, 156 (Miss. 2004).

**II.**

¶24.    In order to fully apply the standard of review in this case, we begin by clearly defining the issues JSU raised with the trial court in its Motion for Summary Judgment ("Motion").  This will set the parameters for the search for material issues of triable fact.

¶25.    In its Motion, JSU stated: "In order to survive summary judgment and succeed on her claim, the plaintiff must show that the acts of the assailants were foreseeable and the alleged negligence of the defendant proximately caused the plaintiff's injuries." JSU then stated that "the defendant's conduct must then cause the loss, by natural and continuous sequence, unbroken by any intervening causes."  Stated differently, JSU claims it was entitled to summary judgment because (1) Glover's injuries were not foreseeable; (2) JSU's alleged negligence was not the proximate cause of Glover's injuries; and (3) the criminal acts of Chase and Cannada were superceding, intervening causes of Glover's injuries, thereby absolving JSU of any responsibility.

¶26.    JSU did not argue in its Motion that it was entitled to summary judgment on the issues of (1) whether it was negligent; (2) whether it is vicariously liable for the negligence of its bus driver, Doug Luster; or (3) whether Glover suffered damages when she was raped by Cannada and Chase.  And although JSU does dispute Glover's contention that Luster left the children at the wrong location, all three children testified otherwise, requiring this Court (for purposes of summary judgment) to accept as true the children's version.

¶27. On motion for rehearing, JSU reminds us that, in ***Glover I***, this Court held itself bound by the federal court's ruling, that is, that the rape was unforeseeable to Luster.[8] JSU argues that we are now bound by both collateral estoppel and the "law of the case," which prohibits us from finding that Glover's rape was foreseeable to Luster. As will be discussed later, whether or not Luster should have foreseen a rape is not the issue before us. Rather, we are required to determine whether a fact-question exists as to JSU's negligence.

¶28. In analyzing this summary judgment appeal, we are bound to accept that Luster knew that the boys had a propensity toward illegal behavior, and that the campus was a dangerous place to leave children unattended. For purposes of analyzing the grant of summary judgment, we must accept that Luster was acting within the course and scope of his employment at JSU. Consequently, we must accept, for summary judgment purposes, that JSU possessed the same knowledge as Luster. It now falls upon us to analyze whether JSU's knowledge (both direct and imputed),[9] coupled with its conduct, creates a triable issue of fact as to Glover's claims against JSU. Because of their intertwined and dependent relationship, proximate cause and foreseeability will be discussed together.

---

[8] It is noteworthy that the issue before the federal court was not the liability of Luster or Epps, but rather whether Epps's insurance policy required the insurance company to provide Epps a defense to the suit.

[9] An employee's knowledge is imputed to his employer. 30 C.J.S. *Employer-Employee* § 211 (1992); *see also* Restatement (Third) of Agency § 5.03 (2006) (Illustration 5-7); ***Southport Little League v. Vaughan***, 734 N.E.2d 261, 275 (Ind. 2000) (holding that employees of Little League had sufficient knowledge, imputed to the organization, to raise red flags about child molestation by volunteer); ***Bourgois v. Montana-Dakota Utils. Co***., 466 N.W.2d 813, 817 (acknowledging that "corporations know facts because those facts are in the minds of corporate officers or agents") (N.D. 1991); ***Sulik v. Central Valley Farms***, 521 P.2d 144, 828 (Id. 1974) (concluding that, if employee was in fact an agent of farm corporation, then his knowledge would be imputed to corporation).

## III.

¶29. No citation of authority is necessary for the proposition that, to recover for injuries in a negligence claim, a plaintiff must prove that the defendant was negligent, and that such negligence was the proximate cause, or a proximate contributory cause, of the injuries. The legal definition of negligence is fairly simple, universally applied, and likewise needs no citation of authority. Negligence is doing what a reasonable, prudent person would not do, or failing to do what a reasonable, prudent person would do, under substantially similar circumstances. The simplicity of this definition of negligence obscures the complexity of the concept of proximate cause.

¶30. Upon careful review of our precedent, which has applied numerous proximate cause analyses to various factual settings, we find the law of proximate cause requires some clarification.[10]

¶31. For a particular damage to be recoverable in a negligence action, the plaintiff must show that the damage was proximately caused by the negligence. In order for an act of negligence to proximately cause the damage, the fact finder must find that the negligence was both the cause in fact and legal cause of the damage. Dobbs, The Law of Torts, § 180 at 443 (2000).

¶32. A defendant's negligence is the cause in fact of a plaintiff's damage where the fact finder concludes that, but for the defendant's negligence,[11] the injury would not have

---

[10] For a discussion of this Court's various applications and interpretations of proximate cause, see Appendix A, hereto.

[11] The test is slightly different in cases where a plaintiff's injuries are brought about by the negligence of more than one tortfeasor. In such cases, the test is whether the negligence of a

13

occurred. Stated differently, the cause in fact of an injury is "that cause which, in natural and continuous sequence unbroken by any efficient intervening cause, produces the injury and without which the injury would not have occurred." *Gulledge v. Shaw*, 880 So. 2d 288, 293 (Miss. 2004).

¶33. A defendant's negligence which is found to be the cause in fact of a plaintiff's damage will also be the legal cause of that damage, provided the damage is the type, or within the classification, of damage the negligent actor should reasonably expect (or foresee) to result from the negligent act. Dobbs, The Law of Torts, § 180 at 443.

¶34. We recently considered the issue of proximate cause where a bus driver, delivering an elderly lady to a day-care center, assisted the lady off the bus, but left her unattended in the parking lot. *City of Jackson v. Estate of Stewart Ex. Rel Womack*, 908 So. 2d 703 (Miss. 2005) She fell, hitting her head on the pavement, and later suffered a stroke. *Id*. at 706-07. The plaintiff presented expert testimony that the defendant's negligence was the cause-in-fact of the stroke, which in turn, caused the lady to suffer pneumonia and urinary tract infections. However, we made it clear that the defendant's negligence must not only be the cause in fact of these injuries and damages, but also the legal cause, that is, the damages must also have been a reasonably foreseeable consequence of the defendant's negligence. We defined the issue presented as "whether a stroke is the type of damage which reasonably should be anticipated (or foreseen before the fact) as a result of negligently allowing an elderly person to fall in a parking lot." *Id*. at 713, *Smith v. United States*, 284

---

particular tortfeasor was a substantial factor in bringing about the harm. Dobbs, The Law of Torts, § 171 at 415.

F. Supp 259 (S.D. Miss. 1967) (citing **Donald v. Amoco Prod. Co**., 735 So. 2d 161 (Miss. 1999); **Williams**, 183 Miss. 723, 185 So. 234 (1938)).

¶35.    The plaintiff's expert testified that the fall could have caused the stroke, and the stroke, in turn, could have caused the lady to suffer pneumonia and urinary tract infections. **City of Jackson**, 908 So. 2d at 713.  The plaintiff argued that, because some injury should have been anticipated as a result of the negligent act of allowing the lady to fall, the defendant was liable for all damages caused, regardless of whether they were foreseeable. Unpersuaded by this argument, this Court stated:

> Although [plaintiff's expert] offered a great deal of testimony concerning whether the fall . . . caused the stroke, and whether the stroke caused [the lady's] other numerous maladies, he offered no testimony which sheds light on the question of whether stroke was a foreseeable risk or expected consequence of the fall.

*Id*. at 714.

¶36.    On the other hand, the defendant's expert, directly addressing the foreseeability of the stroke, testified:

> It would be extremely uncommon, almost unheard of for a minor fall to cause a stroke . . . any minor head trauma should not cause a stroke . . . .  I am saying that head trauma per se is not really cause for strokes.  It's not a precipitating factor for strokes, you know.

*Id*. at 714-14.  Therefore, the issue was not whether the fall caused the stroke, or whether the defendant reasonably could have foreseen that some type of damage would occur as a result of the fall.  Rather, the issue was whether stroke was within the type or category of damages reasonably caused by trauma to the head.  We stated:

> In order to recover damages related to the stroke . . . the Estate must show more than negligent conduct which resulted in damages; it must show not only

15

that the stroke resulted from the fall and that the fall resulted from a defendant's negligence, but also that a stroke is a reasonably foreseeable consequence of the alleged negligent act. That is, the estate must show that where one negligently allows a person like [the plaintiff] to fall, stroke is a *type of damage* that is reasonably probable to occur.

*Id*. at 712 (emphasis added). In holding there could be no recovery for damages related to the stroke, we stated:

It should certainly be anticipated that negligently allowing an elderly person to fall in a parking lot could lead to many kinds of injuries including a broken arm, cuts, bruises, or even concussion. The exact injury need not be expected, anticipated or even contemplated. But those are injuries brought about by trauma. A stroke is not an injury but rather a medical condition which (according to [defendant's] unrebutted testimony) is not an anticipated result of trauma.

*Id*. at 715.

¶37. We reiterate today that, in satisfying the requirement of foreseeability, a plaintiff is not required to prove that the exact injury sustained by the plaintiff was foreseeable; rather, it is enough to show that the plaintiff's injuries and damages fall within a particular kind or class of injury or harm which reasonably could be expected to flow from the defendant's negligence. *Id.*; *see also* **Gulledge**, 880 So. 2d at 293.

¶38. To illustrate, one who negligently drives an automobile reasonably should foresee that his or her negligence could be expected to cause certain kinds or categories of damages. Such categories would of course include (among others) traumatic injury, medical bills, lost wages, and pain and suffering. And in order to recover a particular damage (such as compensation for a broken leg or reimbursement for an MRI), the plaintiff will not be required to prove the tortfeasor actually contemplated that his or her negligence would lead to a broken leg or an MRI. To the contrary, the plaintiff will be allowed to recover for all

16

injuries and damages reasonably expected to result from automobile accidents. However, if the accident also caused the plaintiff to miss a flight to London and, consequently, miss attending an auction and a once-in-a-lifetime opportunity to purchase a rare piece of art, the negligent automobile driver ordinarily would not be liable for such unforeseeable damages. This is so because they are not included within the type or category of damages a tortfeasor ordinarily should expect or foresee would result from careless driving.

¶39.    This leads us to three questions: (1) whether JSU should have foreseen that its negligence reasonably could be expected to lead to some type or category of injury and damage and, if so, (2) whether the injuries and damages suffered by Glover were within that type or category and, if so, (3) whether JSU's negligence must be disregarded because of an intervening, superseding cause. Addressing these questions will require a closer look at the facts surrounding JSU's negligent act. It bears repeating that, in rendering its decision today, this Court is required to view all evidence in the light most favorable to the plaintiff.

### III.

¶40.    On the day the rapes occurred, JSU knew that both Chase and Cannada had violent tendencies. Cannada had been expelled from the program in a previous year for fighting. JSU also knew of the accusations that Glover had been inside the boys' rest room, suggesting some kind of sexual activity. A reasonable fact-finder could certainly conclude that, had JSU conducted a thorough investigation, it would have learned that Glover had been in the restroom having sex with Cannada.

17

¶41. We are of the opinion that – given JSU's knowledge of both the boys' violent tendencies, coupled with the sixty-three crimes[12] which were reported to have occurred on the JSU campus during the three months prior to the rape – a fact-finder could find that JSU failed to provide adequate supervision and security on its premises. In addition, we find that a reasonable fact-finder could conclude that, because of inadequate security and supervision, JSU should have foreseen that some harm could come to Glover, and that the type of harm was sexual activity and/or violence. As discussed before, although the specific harm of forcible rape may not have been contemplated by JSU, rape is nonetheless both a violent and sexual act; and our law requires only that the defendant foresee that some violent act or impermissible sexual act might occur, not the particular violent or sexual act.

¶42. For these reasons, we find that the facts presented – when viewed in the light most favorable to Glover's case – could lead a reasonable juror to find that Glover's injuries and damages were a foreseeable consequence of JSU's negligence. Thus, we further find that summary judgment was inappropriate.

### IV.

¶43. JSU's argument that the rape was an intervening, superceding cause of Glover's damages has no merit. Our precedent clearly establishes that, where the intervening cause of injury was foreseeable, it cannot supercede the liability of the defendant. *See, e.g., Southland Mgmt. Co. v. Brown*, 730 So. 2d 43 (Miss. 1998). Because a reasonable fact-finder could conclude that JSU was fully aware that Chase and Cannada both had violent

_____

[12]We again point out that twenty-one of these reported crimes were violent, and four were reports of rape and sexual battery.

18

tendencies, and that Glover had been in the boys' restroom having sex with one of the boys in the program, summary judgment based upon the doctrine of intervening, superceding cause is inappropriate.

¶44. Accordingly, we hold that Glover has produced sufficient evidence to escape summary judgment, and this matter is remanded for trial.

¶45. **REVERSED AND REMANDED**.

**DIAZ, P.J., AND RANDOLPH, J., CONCUR. LAMAR, J., CONCURS IN PART AND IN RESULT. WALLER, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION JOINED IN PART BY RANDOLPH, J. EASLEY, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, C.J., AND CARLSON, J. GRAVES, J., NOT PARTICIPATING**

APPENDIX

Proximate Cause – Mississippi Precedent

¶46. In reviewing this Court's plentiful precedent on proximate cause, we are struck by the numerous and sometimes facially inconsistent proclamations. One easily could argue this Court's definition of proximate cause in one case to establish the incorrectness of another. This facial inconsistency appears to result from this Court's reference in many prior cases to only so much of the law of proximate cause as was necessary to decide the case then pending before the Court.

¶47. For instance, in *M & M Pipe and Pressure Vessel Fabricators, Inc. v. Roberts*, 531 So. 2d 615 (Miss. 1988), this Court said:

> In determining whether the actor's negligence was the proximate cause of the injury, it is not necessary that the actor should have foreseen the particular injury that happened; it is enough that he [or she] could have foreseen that his [or her] conduct could cause some injury.

*Id*. at 618 (*citing **Cumberland Tel. & Tel. Co. v. Woodham***, 99 Miss. 318, 332, 54 So. 890, 891 (1911)).  This language often is cited literally, and is argued to mean that, so long as a defendant reasonably should foresee that his or her negligent conduct could cause *some* injury, the defendant will be liable for any and all injury flowing from the negligence, regardless of the type or category of those additional injuries, and regardless of how remote or unforeseeable they may be.

¶48.    However, in ***Mauney v. Gulf Refining Co.***, 193 Miss. 421, 9 So. 2d 780, 781 (1942), this Court divided injuries resulting from negligent conduct into two classifications: those which are reasonably foreseeable (for which a plaintiff may recover), and those which are not reasonably foreseeable (for which a plaintiff may not recover).  Specifically, the ***Mauney*** Court held:

> The settled law in this state may be summarized in the form of a diagram, as follows: The area within which liability is imposed is that which is within the circle of reasonable foreseeability using the original point at which the negligent act was committed or became operative, and thence looking in every direction as the semidiameters of the circle, and those injuries which from this point could or should have been reasonably foreseen as something likely to happen are within the field of liability, while those which, although foreseeable, were foreseeable only as remote possibilities, those only slightly probable, are beyond and not within the circle, – in all of which time, place and circumstances play their respective and important parts.

*Id*. at 780-81.   Thus, by excluding from recovery damages from injuries which are "foreseeable only as remote possibilities," ***Mauney*** calls into question the notion from ***M & M Pipe***, which, many argue, declares such damages are indeed recoverable.

20

¶49. In reaching its decision, the *Mauney* Court attempted to reconcile what appears to be conflicting language from *Gulf Refining Co. v. Williams*, 183 Miss. 723, 185 So. 234 (1938), by stating:

> In [Williams], it was pointed out that in speaking of possible results as applied to foreseeability it has not been meant to include only those more apt to happen than not to happen, but embraces those which the negligent actor should have foreseen as something likely to happen, although the likelihood may not amount to a comparative probability . . . .

*Mauney*, 9 So. 2d at 781. Any fair reading of this language leads to the conclusion that, at least from the *Mauney* Court's perspective, the *Williams* Court did not equate the terms "more apt to happen," "likely to happen," and "comparative probability."[13]

¶50. To complicate matters, the *Mauney* Court gleaned from *Williams* still another test for foreseeability, which states "that more than a remote possibility is necessary to fulfill the requirements of the rule of liability, – that the likelihood which furnishes the essential ligament between the negligence and the injury must be one of weight and moment." *Mauney*, 9 So. 2d at 781.

¶51. A more clear and concise analysis is found in *Gulledge v. Shaw*, 880 So. 2d 288 (Miss. 2004), which recognized and applied, in part, the *Mauney* approach. Chief Justice Smith, speaking for the *Gulledge* Court, stated:

> The fact that an injury rarely occurs, or has never happened, is insufficient to protect the actor from a finding of negligence. If *some* injury is to be anticipated, this Court will find liability even if the *particular* injury could not be foreseen . . . . However, "[r]emote possibilities do not constitute negligence from the judicial standpoint." That is, we do not charge the actor with a

---

[13]We find little support for the *Mauney* Court's distinction. Every dictionary consulted yields similar definitions for an event which is "apt" to happen, "likely" to happen, and "probably" will happen.

"prevision or anticipation which would include an unusual, improbable, or extraordinary occurrence, although such happening is within the range of possibilities." (citing *Mauney*).

*Id*. at 293 (citations omitted, emphasis in original).

¶52. Thus, we are left to reconcile the language of *M & M Pipe*, which would allow recovery for unforeseeable injuries (so long as some injury is foreseeable); the language of *Mauney*, which precludes recovery not only for unforeseeable injuries, but also for injuries which, although foreseeable, were remote possibilities; and the language of *Williams*, which held that foreseeable damages are those which are likely to occur, although not necessarily probable.

¶53. Then we must consider the considerable line of cases extending back to 1936, holding that

> [t[he proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produced the injury, and without which the result would not have occurred; or, as otherwise stated, there must be an efficient causal connection between the negligence complained of and the injury, and that connection must be a natural and continuous sequence unbroken by any other cause.

*Thompson v. Miss. Cent. R.R. Co*., 175 Miss. 547, 166 So. 353-54 (1936). Thus, the proximate-cause test announced in *Thompson* ignores the foreseeability inquiry altogether, and looks only to the causal connection between the negligence and the injury.

¶54. To confuse matters even more, this Court has quoted with approval the following provision from a legal treatise:

> "If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable." Section 435, Restatement, Law of Torts.

22

*Matthews v. Thompson*, 231 Miss. 258, 95 So. 2d 438, 448 (1957). This Restatement analysis ignores both *Manney's* foreseeability requirement and *Thompson's* continuous-sequence-and-causation test, and instead merely requires that the negligence be a "substantial factor" in bringing about the damage.

¶55. Finally, in *Wyeth Laboratories, Inc. v. Fortenberry*, this Court recognized that proximate cause in a negligence claim requires proof that the defendant's negligence was both a cause in fact and a legal cause of the plaintiff's injuries. *Fortenberry*, 530 So. 2d 688, 691 (Miss. 1988) However, the *Fortenberry* Court, approving the "but-for" approach to proximate cause, required only a finding that the negligent act caused the damage (cause in fact) and a finding that, but for the negligence, the damage wouldn't have occurred. The *Fortenberry* discussion of proximate cause includes no discussion of the requirement of foreseeability. *Id.*

¶56. These cases, and this Court's current view of the requirements to show proximate cause, are included in part III to this opinion.

**WALLER, PRESIDING JUSTICE, CONCURRING:**

¶57. I agree with the result reached by the plurality and similarly am puzzled that this matter is back before the Court without any indication that the issue "whether JSU had in effect a policy of liability insurance which would cover a tort suit for Glover's injuries" was addressed below. *Glover v. Jackson State Univ.*, 755 So. 2d 395, 405 (Miss. 2000). Unlike the plurality, however, I see no need to connect Douglas Luster with Jackson State University by an employer/employee relationship to find the trial court erred in granting summary judgment to Jackson State.

23

¶58.   Jackson State University owes Glover, and anyone else entering the premises by invitation, a duty of reasonable care to protect them from reasonably foreseeable injury at the hands of others on its premises. *Grisham v. John Q. Long V.F.W. Post, No. 4057, Inc.*, 519 So. 2d 413, 416-17 (Miss. 1988). Jackson State, by voluntarily hosting and staffing the National Youth Sports Program, inviting minors like Glover to participate, supervising them, and contracting with Ace Rental to transport participants to and from campus, assumed a duty to perform these tasks in such a manner that participants like Glover would not suffer loss due to its negligence. *See Dr. Pepper Bottling Co. v. Bruner*, 245 Miss. 276, 282, 148 So. 2d 199, 201 (1962). While the federal court may have decided the acts of Cannada and Chase constituted intervening and superceding causes which precluded the assessment of liability to Epps and Luster, it made no comment as to any other duties owed by the other parties to this suit or causation. Our previous opinion left the matter of Jackson State's liability unresolved and, as the plurality accurately notes, the question of Jackson State's liability on summary judgment hinges upon whether Jackson State met its burden to demonstrate no genuine issues of material fact exists as to causation. Plur. op. at ¶ 25.

¶59.   I agree with the plurality that Jackson State did not meet this burden. There is enough evidence in the record of criminal activity on the campus of Jackson State to make causation a question for the court sitting as jury. Plur. op. at ¶ 41, 43. This evidence exists independently of Luster's knowledge, actions, or employment status. Therefore, I find this relationship immaterial to the outcome reached by the plurality. I would avoid the error alleged on rehearing by removing Luster from the causation equation altogether.

**RANDOLPH, J., JOINS THIS OPINION IN PART.**

24

**EASLEY, JUSTICE, DISSENTING:**

¶60.    As I would affirm the trial court's grant of summary judgment in favor of Jackson State University (JSU), I am compelled to write to address the plurality's holding regarding imputed knowledge and its reversal and remand to the trial court for trial.

¶61.    The facts of this case involve the deplorable rape of a fourteen-year-old girl by two fifteen-year-old  boys.  Both of these young men pleaded guilty to the crime of rape and served five years in prison for their criminal behavior.  This case, however, concerns only the alleged civil liability of JSU.  Glover sued JSU for failure to provide adequate security and reasonably safe premises.  While the facts surrounding the case are horrendous, JSU has no liability for the intentional and unforeseeable, intervening criminal actions of these two individuals.  In addition, the imputed-knowledge analysis by the plurality expands liability in Mississippi.  There is no evidence that Doug Luster, a bus driver and program worker, had any knowledge of any alleged sexual activity to impute to JSU.  No deposition testimony from any of the deponents stated that Luster knew about any alleged sexual activity occurring in the boys' bathroom two days prior to Glover's rape.  The plurality's position as to Luster's knowledge is pure speculation and not based on the evidence.

¶62.    Glover claimed that JSU failed to provide adequate security and reasonably safe premises for her when she attended the National Youth Sports Program (NYSP) at the JSU campus in 1993.  She claimed that this negligence resulted in her rape by fellow NYSP participants Lohorace Cannada and Christopher Chase.

¶63.    In July 2005, JSU filed a motion for summary judgment in the Hinds County Circuit Court.  JSU's motion alleged that Cannada's and Chase's criminal acts were unknown and

25

unforeseeable to JSU.  In addition, JSU argued that any alleged negligence by the university was not the proximate cause of Glover's injuries.  In September 2005, the trial court granted JSU's motion for summary judgment.  In the order, the trial court found that Glover's rape was not reasonably foreseeable, and the rape was due to the criminal acts of Cannada and Chase.  Glover appealed the ruling to this Court.

## I.

¶64.    In the summer of 1993, Glover participated in the NYSP program located at the campus of JSU.[14]  Her complaint alleges that on June 18, 1993, Doug Luster, the bus driver, picked up Glover and other NYSP participants including Cannada, Chase, and Antonio Pugh. Luster dropped off Glover and the other participants at the Athletics and Assembly Center. However, the NYSP program was being held that day at the T.B. Ellis Building.[15]  When it was discovered that the NYSP program was being held in the T.B. Ellis Building, all of the NYSP participants boarded the bus to the correct facility with the exception of Glover, Cannada, Chase, and  Pugh.  Thereafter, Glover alleged that she was raped in the stairwell by Cannada and Chase, and Pugh acted as their lookout person.  Glover then told a campus

---

[14]  Glover filed suit against NYSP and JSU in their individual capacities for her alleged injuries.  The NYSP program is a *national* program that administers federal funding to  institutions throughout the United States.  *Glover v. Jackson State University*, 755 So. 2d 395, 400 (*Glover I*). The sports program is for socio-economically disadvantaged children.  *Id*.  This Court in *Glover I* affirmed the circuit court's grant of summary judgment in favor of NYSP.  *Id*.

[15]  In his deposition, Luster stated that he never let any of the children off the bus at the incorrect locations on June 18.  In addition, Luster never stated that he knew of Malikah  allegedly being in the boys' bathroom having sex on the first day of the program.  Luster stated that Malikah denied being in the boys' bathroom when he questioned her, even though another boy claimed otherwise.  Luster also never stated that there was an allegation that any of the children were having sex in the bathroom.  Luster investigated only  whether  Malikah was in the boys' bathroom.

26

policeman about the rape. The Jackson Police Department arrested Cannada and Chase.

Both Cannada and Chase pleaded guilty to rape and were sentenced to prison.

## II.

¶65. In *Titus v. Williams*, 844 So. 2d 459, 464 (Miss. 2003), this Court set forth the standard of review for motions for summary judgment as follows:

> The standard for reviewing the granting or the denying of summary judgment is the same standard as is employed by the trial court under M.R.C.P. 56(c). This Court conducts de novo review of orders granting or denying summary judgment and examines all the evidentiary matters before it--admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If, in this view, the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise, the motion should be denied. Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite. In addition, the burden of demonstrating that no genuine issue of fact exits is on the moving party. That is, the non-movant would be given the benefit of the doubt. *McCullough v. Cook*, 679 So. 2d 627, 630 (Miss. 1996) (collecting authorities).

¶66. In *Crain v. Cleveland Lodge 1532, Order of Moose*, 641 So. 2d 1186, 1189 (Miss. 1994), this Court addressed whether a lodge was negligent for alleged failure to provide security in its parking lot. This Court held:

> To prove at trial that the Moose Lodge was negligent, Crain must show a) the duty owed him by the Moose Lodge; b) a breach of that duty; c) damages; and d) a causal connection between the breach and the damages, such that the breach is the proximate cause of his injuries. *Lyle v. Mladinich*, 584 So. 2d 397, 398 (Miss. 1991). *Grisham v. John Q. Long V.F.W. Post, No. 4057, Inc.*, 519 So. 2d 413, 416 (Miss. 1988); *Burnham v. Tabb*, 508 So. 2d 1072 (Miss. 1987); *Boyd v. Lynch*, 493 So. 2d 1315 (Miss. 1987).

*Id*.

27

¶67.    In *Grisham*, 519 So. 2d at 416, this Court considered the duty of the V.F.W., which sold alcohol on its premises, to a patron from an assault by a third party.  In the context of the duty owed by a bar or tavern keeper, this Court held:

> Numerous jurisdictions have considered the duty of a bar keeper or tavern keeper to protect patrons from assaults, and in almost all of those decisions the duty has been described as follows: the keeper of a bar or tavern, though not an insurer of his guests' safety, has a duty to exercise reasonable care to protect them from **reasonably foreseeable injury at the hands of other patrons**. Annotation at 43 A.L.R. 4th 281 and cases collected therein.  Authorities indicate, however, that the owner can be liable only where he had cause to anticipate the wrongful or negligent act of the unruly patron.  C.J.S. Negligence 63(118) and 63(127).  The requisite "cause to anticipate" the assault may arise from 1) actual or constructive knowledge of the assailant's violent nature, or 2) actual or constructive knowledge that an atmosphere of violence exists in the tavern.

*Id*. at 416-417 (emphasis added) (citations omitted); *see also* ***Corley v. Evans***, 835 So. 2d 30, 38-39 (Miss. 2003).  More recently, in ***Corley***, this Court affirmed the two-prong test for foreseeability when injury occurs as a result of a third party.  ***Corley***, 835 So. 2d at 38-39. This Court held in ***Corley***:

> [There are] two ways to establish legal causation, or foreseeability, in cases of assault by a third person.  "The requisite 'cause to anticipate' the assault may arise from (1) actual or constructive knowledge of the assailant's violent nature, or (2) actual or constructive knowledge that an atmosphere of violence exists [on the premises]. . ." ***Lyle***, 584 So. 2d at 399 (quoting ***Grisham***, 519 So. 2d 413 at 416). Evidence of the existence of an atmosphere of violence may include "the overall pattern of criminal activity prior to the event in question that occurred in the general vicinity of the defendant's business premises, as well as the frequency of criminal activity on the premises." ***Lyle***, 584 So. 2d at 399.

*Id*.

¶68.    This Court also considers the issue of foreseeability in the context of proximate cause. "The proximate cause of an injury is that cause which in natural and continuous sequence

28

unbroken by any efficient intervening cause produces the injury, and without which the result would not have occurred." **Grisham**, 519 So. 2d at 417; *see also **Titus***, 844 So. 2d at 466. In addition, this Court has held that proximate cause occurs "when the omission of a duty contributes to cause the injury." **Id**.

¶69. Here, Glover failed to demonstrate that JSU had (1) imputed knowledge from Luster that Glover engaged in sexual activity with one of the assailants two days prior to her rape, as the plurality suggests; (2) actual or constructive knowledge of the assailants' violent nature; or (3) actual or constructive knowledge that an atmosphere of violence existed on the premises that was foreseeable and the proximate cause of Glover's attack by the individuals. Therefore, I would affirm the trial court's grant of summary judgment in favor of JSU.

A.    Luster's Testimony.

¶70. The plurality holds in its summary judgment analysis that the Court must accept that "JSU possessed the same knowledge as Luster" and determine "whether JSU's knowledge (both direct and imputed), coupled with its conduct, creates a triable issue of fact as to Glover's claim against JSU." (Plurality op., ¶ 28). The record before the Court today reveals that there was no evidence that Luster had knowledge of alleged sexual activity to impute to JSU.

¶71. In his deposition testimony, Luster revealed that he merely questioned Glover as to whether she had been in the boys' bathroom. The plurality holds that "JSU also knew of the accusations that Glover had been inside the boys' rest room, *suggesting some kind of sexual activity*." (Plurality op., ¶ 40) (emphasis added). With all due respect to my colleagues in the plurality, I believe that the plurality has overstated the evidence. Luster's own testimony,

29

which the plurality imputes to JSU, does not reveal that Luster had any knowledge at the time he spoke to the children in the hallway of any activity that "***suggest[ed] some kind of sexual activity***" occurring in the bathroom. Luster's complete testimony on this issue was as follows:

> Q. Did you ever have to investigate any complaints concerning [Glover's] behavior?
>
> A. Yes, I did.
>
> Q. Would you please describe to me what that situation was?
>
> A. On that Monday I believe it was, on that Monday we were - - yeah, that Monday, we were in the Athletic & Assembly Center, and a little boy came and said some girls - - well, a girl was in the boys restroom. And my group was in basketball at that time, so the lady that was in charge of basketball, I told her I needed to go around here and find out what's going on. Well, I said to get these kids out of the hallway. That's what I said. So I went in the hallway, and there was [Glover]. So I went in the hallway, and there was [Glover] standing at the boys bathroom. And I questioned her. I said were you in the boys bathroom. She said no. There was another little girl standing there with her. I don't recall who it was. I said were y'all in the boys bathroom. They kept telling me no that they were not in the boys bathroom. The little boy kept insisting that she was in the boys bathroom. So I just said everybody get out of this hall. Let's go. Go back to your group. Everybody go to your group. Clear the hallway. So I cleared that hallway around there by the boys bathroom, and everyone went back to their particular groups.

Accordingly, Luster's testimony reveals that at the time he questioned the children in the hallway, there was no evidence of his knowledge of any alleged sexual activity to impute to JSU.

30

## B.    Violent Nature.

¶72.    Glover argues that she provided enough evidence that JSU had actual knowledge of Cannada's and Chase's propensity for violence. Glover cites to Cannada's and Chase's deposition and affidavit evidence. Both of these young men acknowledged that they participated in the program and had had several fights with other participants in past years.

¶73.    In *In re Minor Child*, 941 So. 2d 820, 828 (Miss. Ct. App. 2006), *cert denied*, 942 So. 2d 164 (Miss. 2006), the Court of Appeals upheld a premises-liability claim for the rape of a young girl at an apartment complex based on the complex's alleged knowledge of the perpetrator's violent nature.

¶74.    Here, Glover's case is easily distinguished from the factual situation in *In re Minor Child*. Glover claims that JSU had actual knowledge of the two boys' prior violent acts, *i.e.* fighting, because the supervising adults knew of the fights. However, W.C. Gordon, the program administrator, stated in an affidavit that he was not aware of the young men's violent propensities.

¶75.    In *In re Minor Child*, the assailant, Tony Kelly, trespassed on the premises of Federation Towers Apartments over the course of months and raped K.D. as many as six times. *In re Minor Child*, 941 So. 2d at 824. K.D. asserted that the apartment management knew of Kelly's violent nature because James Gray, the night manager, heard K.D. call to him and ask for help to no avail. *Id*. Gray claimed that K.D. did not call out to him. *Id*. However, Gray did state that he narrowly missed witnessing a sexual encounter involving K.D. *Id*. Gray claimed that he heard someone run away as he walked down a hallway and saw K.D. adjusting her clothes. *Id*. at 824-25. The Court of Appeals reasoned that "it is

better to err on the side of denying summary judgment" and found that viewing the evidence in the light most favorable to K.D., Federation Towers had actual or constructive knowledge of Kelly's violent nature after the first rape. *Id.* at 828. In other words, the Court of Appeals found that Federation Towers did not have actual or constructive knowledge of Kelly's violent nature the first time that K.D. was raped, however, it had actual or constructive knowledge at the times of the five subsequent rapes. *Id.*

¶76.   Here, JSU had no actual or constructive knowledge of Cannada's or Chase's violent tendencies toward rape. While there is conflicting evidence as to whether JSU knew of the boys' propensities to fight, there is no evidence of any prior acts of rape by them. Unlike *In re Minor Child*, there was no allegation that any JSU employee saw any portion of Glover's rape. Also, in *In re Minor Child*, Kelly, a trespasser to the Federation Towers premises, entered the property and committed the same violent act at least six times. Here, the boys were participants in an athletic program over the course of a few years and committed rape on only one occasion. Prior to this incident reported by Glover, JSU had no knowledge of Cannada's and Chase's propensity to rape.

¶77.   The circuit court found that the boys' fighting amounted to "adolescent horseplay" which was insufficient notice to JSU that the boys had a propensity to rape. More specifically, the trial court stated:

> While the plaintiff offers deposition testimony from *the alleged assailants* that they *had been previously disciplined in the program, their acts can best be described as adolescent horseplay between 13 year old boys. Being on notice that young teenage boys occasionally fight amongst themselves is hardly notice of a propensity to rape.* Without such knowledge, it is impossible for JSU and its employees to forsee that a rape would occur in the event that these youths were dropped off at the wrong location. Here, Glover's alleged rape

32

was outside the circle of foreseeability and the trier of fact could not reasonably find otherwise because the rape was the product of intervening criminal acts of third parties.

(Emphasis added).

¶78. The violent act at issue before this Court is the rape of a young girl, not simple school-boy antics. Adolescent fights are not uncommon actions for teenage boys. Rape, however, has a heightened degree of violence that cannot reasonably be compared to adolescent fighting by any measure. Fighting with other adolescents does not equate to a propensity for violence or for raping another individual, and to find otherwise simply defies a reasonable-foreseeability standard. Accordingly, Glover failed to demonstrate that JSU had active or constructive knowledge of Cannada's and Chase's violent tendencies toward rape.

### C.    Atmosphere of Violence.

#### 1.    Foreseeability.

¶79. Glover argues that she presented sufficient evidence of violent crimes that occurred at JSU prior to her rape, relying on *Gatewood v. Sampson*, 812 So. 2d 212 (Miss. 2002). In *Gatewood*, Roy Sampson entered the parking lot of the Ellis Isle Exxon to buy gas and used the pay telephone. He was shot by other individuals who entered the premises owned by Gatewood. *Gatewood*, 812 So. 2d at 216. Sampson provided a list of crimes committed in the vicinity of the gas station. *Id*. at 220. Here, Glover also introduced records of crimes committed within the vicinity of JSU. Rape and sexual battery were among the reported crimes on the JSU campus.

¶80. The trial court found that Glover's evidence of an "atmosphere of violence" in the vicinity of JSU was irrelevant. The trial court reasoned that no one from the neighboring

33

vicinity wandered onto the campus and raped Glover. Instead, the trial court found that the rape was caused by other participants in the program. Further, the trial court found that "the mere fact that JSU is situated in a high crime area does not alone serve to make the sexual activity of Glover, Canada (sic), Chase or Pugh foreseeable." Therefore, the trial court clearly based its ruling on Glover's failure to adequately demonstrate foreseeability. I agree with the trial court's reasoning in this case.

¶81. Glover's case also is distinguishable from *Gatewood* based on the issue of foreseeability. As stated above, Sampson entered the gas station to use its pay phone and buy gas. *Gatewood,* 812 So. 2d at 216. As Sampson used the telephone, a carload of people drove onto the site, and one person exited the vehicle. *Id*. Later, this person shoved Sampson, and the two men fought over a gun carried by the other man. *Id*. During this scuffle, Sampson was shot in the back of the head, and the other man was shot and killed by the other occupants in the car. *Id*. Here, Glover's assailants, Cannada and Chase, were participants in the NYSP program and not some unknown, random rapists who entered the JSU campus from the nearby vicinity.

¶82. In addition, this Court in *Titus* and *Crain*, as well as the Court of Appeals in *Martin v. Rankin Circle Apartments*, 941 So. 2d 854 (Miss. Ct. App. 2006), acknowledged the atmosphere of violence, yet decided the cases on the issue of foreseeability of the injury and looked to situations of intervening causes.[16] This Court clearly has stressed the importance

---

[16]*Titus* was decided by this Court a year after *Gatewood*. If a party demonstrates an atmosphere of violence, that, in and of itself, is not enough to establish liability without considering foreseeability. This creates a situation where a party would always prevail despite other factors because, unfortunately, no area is untouched by crime. Further, to find otherwise would create an overly broad standard for liability. In *Titus*, this Court specifically required the consideration of

34

of foreseeability as the linchpin of an injury, along with proximate cause, notwithstanding a potential showing of actual or constructive knowledge of an assailant's violent nature or an atmosphere of violence. *See Crain*, 641 So. 2d at 1192; *Grisham*, 519 So. 2d at 417.

¶83.   In *Corley*, this Court held that "[w]e said in *Grisham*, 519 So. 2d at 416, that a tavern keeper can only be held liable where he had 'cause to anticipate the wrongful or negligent act of [an] unruly patron.'" *Corley*, 835 So. 2d at 38.   Furthermore, in *Crain*, this Court refused to impose a strict-liability standard on owners for injuries suffered as a result of criminal acts by third parties on their premises. *Crain*, 641 So. 2d at 1191; *see also Corley*, 835 So. 2d at 41; *Martin,* 941 So. 2d at 864.

¶84.   In *Crain*, this Court again considered evidence of an atmosphere of violence and found that the plaintiff, Crain, failed to demonstrate foreseeability and proximate cause for the criminal acts of a third party. *Crain*, 641 So. 2d at 1192.   As Crain exited his car in the lodge parking lot, he suffered significant head injuries from an unknown assailant. *Id*. at 1187.   There was evidence of two crimes committed on the lodge premises within the two years prior to Crain's injury and numerous crimes within the vicinity within sixty months prior to Crain's attack; however, only eleven crimes involved assaults, robberies, and other violent crimes. *Id*. at 1192.   This Court found that this evidence was not enough to foresee Crain's assault. *Id*.   This Court's analysis, however, went even further.   Giving Crain the benefit of doubt, the Court assumed that even if Crain adequately demonstrated the foreseeability of his assault, he still failed to show proximate cause. *Id*.   This Court held that

---

foreseeability when there is an argument of an atmosphere of violence. *Titus,* 844 So. 2d at 466.

35

Crain failed to show that inadequate lighting in the lodge parking lot was the proximate cause of his attack and injuries. *Id*. Therefore, the Court granted summary judgment in favor of the lodge. *Id*.

¶85. The fact that JSU is located in a high-crime area does not satisfy the foreseeability requirement alone. Cannada and Chase were participants in the NYSP program, not unknown criminal rapists who wandered onto the JSU campus from the nearby vicinity and committed the crime. Cannada and Chase were part of the insular NYSP program and not part of a general population within the JSU area. Accordingly, I find that Glover failed to demonstrate foreseeability.

### B. Proximate Cause and Intervening Causes.

¶86. This Court also has considered intervening causes. In *O'Cain v. Harvey Freeman & Sons, Inc.*, 603 So. 2d 824, 830 (Miss. 1991), this Court addressed the issue of intervening criminal acts and held:

> As a general rule of thumb, criminal acts can be intervening causes which break the causal connection with the defendant's negligent act, if the criminal act is not within the realm of reasonable foreseeability. *Touche Ross v. Commercial Union Ins.*, 514 So. 2d 315, 324 (Miss. 1987); *Robinson v. Howard Brothers of Jackson, Miss.*, 372 So. 2d 1074, 1076 (Miss. 1979).

¶87. Furthermore, in *Titus*, a decision handed down after the *Gatewood* case, this Court acknowledged that the owner knew of an atmosphere of violence on the premises and failed to make the area safer. *Titus*, 844 So. 2d at 466. However, this Court found that the plaintiffs failed to establish that Titus's death was proximately caused by the Flash Store or Williams, the owner. *Id*. at 464. Titus was shot and killed by a third party on the Flash Store premises. *Id*. The previous owners had employed a security guard to protect the premises.

36

*Id*. This Court found that Titus's actions of confronting a known, dangerous person who possessed a gun was an intervening cause. *Id*. Therefore, the Flash Store's and Williams's knowledge of the atmosphere of violence was inconsequential, as Titus caused and contributed to his own demise. *Id*.

¶88.   In *Martin*, Patrick Smith was shot and killed on the premises of the Rankin Circle Apartments by a third party. *Martin*, 941 So. 2d at 856.   Evidence was presented showing that the apartment manager was aware of dangerous conditions at the complex. *Id*. at 857-58.   The Court of Appeals' analysis considered the atmosphere of violence at the complex, but it found that the shooter's appearance at the complex was an intervening cause. *Id*. at 864.   The Court of Appeals found that the apartment complex, at most, "'furnished the condition' in which the shooting occurred but did not 'put in motion' the shooting itself." *Id*. (citing *Titus*, 844 So. 2d at 466).

¶89.   Furthermore, Glover's case has a long history before this Court and the federal courts. *See Glover I*, 755 So. 2d 395; *National Fire & Marine Ins. Co. v. Epps, et al.*, No. 3:96cv176BN (S.D. Miss.), *aff'd mem.*, 127 F.3d 35 (5th Cir. 1997).   All defendants, except JSU, have been determined to have no liability to Glover by either this Court or the federal courts.

¶90.   In *Glover I*, this Court set forth the history of a federal court case initiated by the insurance carrier of the bus company that drove the children to the NYSP program.   This Court found:

> Epps' liability insurance carrier, National Fire & Marine Insurance Company, filed a declaratory judgment action (Civil Action No. 3:96cv176BN) in the United States District Court for the Southern District of Mississippi, Jackson

Division, against Epps d/b/a Ace Rental Service, Luster and Glover.  National Fire claimed that its policy did not provide coverage to Epps for the payment or defense of Glover's claims in state court. **United States District Judge William H. Barbour, Jr., granted National Fire's motion for summary judgment, ruling that National Fire was not liable to Glover and had no duty to defend Epps and Luster in the state actions.  Judge Barbour stated, "Glover has submitted no evidence that the bus driver could have foreseen that the male students on the bus would rape Glover when he transported the youths to the wrong location.  In the present case, the Court finds that no jury could reasonably find that the intervening criminal act was foreseeable."** *National Fire & Marine Ins. Co. v. Epps, et al.*, No. 3:96cv176BN (S.D. Miss.), *aff'd mem.*, 127 F.3d 35 (5th Cir. 1997).  After the federal court made its ruling, Epps and Luster added res judicata and/or collateral estoppel claims to their motions for summary judgment pending in state court.  Judge Hilburn granted all the defendants' motions for summary judgment, from which ruling Glover appeals.

*Glover I*, 755 So. 2d at 397 (emphasis added).

¶91.    In the federal district court declaratory judgment action, Judge William H. Barbour, Jr. found that National Fire, the insurance carrier for the bus, had no duty to defend the bus company, C.H. Epps (formerly Ace Rental), or the bus driver, Douglas Luster, and no liability to Glover since Glover failed to prove that the bus driver could have foreseen the boys would rape Glover, and no jury could reasonably find that the intervening criminal act was foreseeable. *Glover I*, 755 So. 2d at 397.   This Court in *Glover I* held that Glover was collaterally estopped from pursing her claim against Epps and Luster based on the federal action, and the trial court did not err by granting summary judgment to Epps and Luster. *Id*. at 400.  In addition, in *Glover I*, this Court also held that the trial court did not err by granting summary judgment in favor of NYSP. *Id*.  This Court stated: "[f]unding a program, without more, does not create sufficient ownership or control to establish either a duty to supervise or a corresponding liability for failure to supervise." *Id*.

¶92. Accordingly, the intervening criminal act of rape was a third-party act for which JSU had no liability. The intervening criminal acts of the boys were the proximate cause and the intervening cause of her injuries.

### III.

¶93. Here, like *Crain*, Glover failed to show that the rape was foreseeable by JSU. Here, a bus driver simply dropped off the NYSP participants at the incorrect location. Also, there was no evidence that any NYSP participants engaged in criminal sexual behavior prior to Glover's rape. It was not foreseeable that the two boys, also participants in the NYSP program with Glover, would commit the criminal act of rape. *See Crane*, 641 So. 2d at 1192 (no showing of a causal link between better lighting in the parking area and the injury suffered by Crain at the hands of his assailant); *see also Grisham*, 519 So. 2d at 417 (no showing that better lighting would have prevented an assault by one ex-wife on another ex-wife).

¶94. Further, the act of rape was a third-party act for which JSU had no liability. The intervening criminal acts of the boys were the proximate cause of her injuries. *See Titus*, 844 So. 2d at 466 (Titus's confrontation of a known, weapon-carrying person which resulted in his death was an intervening cause); *Holliday v. Pizza Inn, Inc.*, 659 So. 2d 860, 866 (Miss. 1995) (no evidence that Pizza Inn proximately caused Holliday's injuries because the stabbing of Holliday by Smith was an intervening cause); *Martin*, 941 So. 2d at 864 (the appearance of Campbell at the apartment was an intervening cause of Smith's death).

¶95. The criminal acts of these two boys were not foreseeable, and the acts were not only an intervening cause of Glover's injuries; they were the sole proximate cause of her injuries.

In *Grisham*, this Court held that the proximate cause of an injury is the "cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury, and without which the result could not have occurred." *Grisham*, 519 So. 2d at 417.

¶96.   Accordingly, Glover failed to prove that JSU had either (1) actual or constructive knowledge of the assailants' violent nature or (2) actual or constructive knowledge that an atmosphere of violence existed on the premises that was foreseeable and the proximate cause of Glover's attack by the two boys.

### IV.

¶97.   For the reasons stated above, I would affirm the judgment of the Circuit Court of the First Judicial District of Hinds County, Mississippi.

**SMITH, C.J., AND CARLSON, J., JOIN THIS OPINION.**