# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-00231-SCT

*TAMARA GLENN, INDIVIDUALLY, AS*
*ADMINISTRATRIX FOR THE ESTATE OF*
*MATTIE HAZEL ALDRIDGE, AND ON BEHALF*
*OF THE WRONGFUL DEATH BENEFICIARIES*
*FOR MATTIE HAZEL ALDRIDGE*

*v.*

*JAMES T. PEOPLES, M. D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/10/2014 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN, JR. |
| TRIAL COURT ATTORNEYS: | JAMES H. THIGPEN |
| | WILLIAM W. FULGHAM |
| | DENNIS J. CHILDRESS |
| | KIMBERLY N. HOWLAND |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | WILLIAM W. FULGHAM |
| ATTORNEYS FOR APPELLEE: | DENNIS J. CHILDRESS |
| | KIMBERLY N. HOWLAND |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 12/10/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

DICKINSON, PRESIDING JUSTICE, FOR THE COURT:

¶1. On April 24, 2010, Dr. James T. Peoples treated Mattie Hazel Aldridge ("Aldridge")

when she presented to St. Dominic Hospital with a recurrent deep-vein thrombosis. During

her stay at the hospital, Dr. Peoples placed Aldridge on anticoagulation therapy. Almost two

months later, on June 25, 2010, after she had been transferred into the care of Trinity Mission

Health & Rehabilitation of Clinton ("Trinity"), Aldridge presented to St. Dominic with a

brain bleed.  And two months after that, on September 24, 2010, Aldridge died.  On May 13, 2011, Tamara Glenn, Aldridge's daughter, filed suit alleging that Dr. Peoples negligently had caused Aldridge's death by prescribing Coumadin.  Dr. Peoples filed a motion for summary judgment, which the trial court granted.  Finding no error, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2.     Dr. Peoples provided medical care for Aldridge beginning on or about April 24, 2010, after she was admitted to St. Dominic with right-leg swelling and pain—which was later diagnosed as a recurrent deep-vein thrombosis (DVT), which occurs when a blood clot (thrombus) forms in one or more of the deep veins in the body.  After conducting a risk-benefit analysis, Dr. Peoples decided to place Aldridge on anticoagulation therapy, specifically prescribing Lovenox and Coumadin.

¶3.     On April 30, 2010, Aldridge was discharged from St. Dominic and transferred into the care of Trinity and its medical director, Dr. Samuel Jones.  At the time of her discharge, Aldridge appeared stable.  She presented a subtherapeutic INR level at 1.79 and was not suffering from any internal bleeding.  INR (international normalized ratio) levels indicate the length of time it takes for blood to clot.  As INR levels rise, blood thinners such as Coumadin are more risky.  In his discharge orders, Dr. Peoples recommended daily INR-level testing and monitoring to ensure that Aldridge's INR levels remained within a safe range.

¶4.     After Aldridge was transferred to Trinity, Dr. Jones took over, and from that point forward was solely responsible for her medical care.  He initially ordered that Aldridge

2

continue to receive Coumadin, and that INRs be drawn. After this initial order, Dr. Jones began monitoring the INR levels and adjusting Aldridge's intake of Coumadin accordingly.

¶5. On May 3, 2010, Aldridge's INR level was supratherapeutic at 3.6. Consequently, Dr. Jones ordered that Coumadin be withheld for a day, but that the intake be resumed at a dosage of five milligrams and that INR levels be rechecked. On May 6, 2010, Aldridge's INR level was still supratherapeutic at 3.4, so Dr. Jones issued orders to withhold Coumadin for two days, then to resume with the five-milligram dose, and to recheck her INR level. On May 10, 2010, Aldridge's INR level was within the therapeutic range at 2.3, so Dr. Jones ordered that the five-milligram dose be continued but did not order any further INR draws.

¶6. On May 24, 2010—after Aldridge complained of severe swelling in her right lower leg—Dr. Jones ordered an INR draw, but the level remained therapeutic at 2.1. Following this incident, Dr. Jones failed to order any further INR draws, despite the fact that a pharmacist consultant recommended that further INR draws be conducted, and despite the fact that Dr. Jones noted his agreement with the pharmacy consultant's recommendation.

¶7. On June 25, 2010—after being out of Dr. Peoples's care for almost two months— Aldridge presented at St. Dominic with a right hemorrhagic stroke (brain bleed), following which she was taken off Coumadin. Two months later, on September 24, 2010, Aldridge died. The nonphysician who filled out Aldridge's death certificate identified the cause of death as a cardiopulmonary arrest, secondary to hemorrhagic stroke (brain bleed).

¶8. On May 13, 2011, Glenn filed a wrongful death action against Dr. Peoples in the Circuit Court of the First Judicial District of Hinds County, alleging that Dr. Peoples had

3

negligently prescribed Coumadin to Aldridge and that the Coumadin had caused her death. Glenn asserted four theories of liability: (1) negligent monitoring, (2) negligent prescription of Coumadin, (3) *respondeat superior*, and (4) *res ipsa loquitor*.

¶9.     On December 16, 2013, Dr. Peoples filed a motion for summary judgment and, with respect to each theory of liability, argued the following: (1) he was not liable for negligent monitoring because his duty to monitor ceased once Aldridge had been transferred into the care of Trinity and Dr. Jones; (2) he was not liable on the negligent-prescription claim because any Coumadin prescribed by him would have been out of her body by the time Aldridge experienced the brain bleed and because no evidence established that the Coumadin actually had caused Aldridge's brain bleed; (3) he was not liable on the basis of *respondeat superior* because he did not have any authority or control over Trinity; and (4) *res ipsa loquitor* did not apply because the elements of the doctrine were not met.   On January 20, 2014, the trial court entered a final judgment granting Dr. Peoples's motion and dismissing Glenn's claims.  Glenn filed a timely notice of appeal on February 11, 2014, raising only one issue—that is,  whether the trial court erred in granting summary judgment to Dr. Peoples on the negligent-prescription and negligent-monitoring claims.

## STANDARD OF REVIEW

¶10.     When reviewing a grant or denial of a motion for summary judgment, this Court employs a *de novo* standard of review.[1]  Summary judgment should be granted only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter

---

[1] **Burleson v. Lathem**, 968 So. 2d 930, 932 (Miss. 2007).

of law.[2] The evidence must be viewed in the light most favorable to the nonmoving party.[3] The party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing that there is a genuine issue for trial."[4]

## ANALYSIS

¶11. To establish a *prima facie* case of medical negligence, the plaintiff must show that:

> (1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury, and; (4) the plaintiff was injured as a result.[5]

### A.    Standard of Care and Breach

¶12. "Mississippi physicians are bound by nationally-recognized standards of care; they have a duty to employ 'reasonable and ordinary care' in the treatment of their patients."[6] "[O]ur law requires a plaintiff to establish—through a qualified expert—what is required of a *minimally competent* [physician], 'whose skills and knowledge are sufficient to meet the licensure or certification requirements for the profession or specialty practiced."[7]

---

[2] Miss. R. Civ. P. 56 (c).

[3] *Duckworth v. Warren*, 10 So. 3d 433, 436 (Miss. 2009).

[4] Miss. R. Civ. P. 56 (e).

[5] *Vaughn v. Miss. Baptist Med. Ctr.*, 20 So. 3d 645, 650 (Miss. 2009).

[6] *Palmer v. Biloxi Reg'l Med. Ctr., Inc.*, 564 So. 2d 1346, 1354 (Miss. 1990) (quoting *Phillips v. Hull*, 516 So. 2d 488, 491 (Miss. 1987)).

[7] *Braswell v. Stinnett*, 99 So. 3d 175, 179 (Miss. 2012) (citing *McCarty v. Mladineo*, 636 So. 2d 377, 381 (Miss. 1994)).

"[Physicians] are not required to do what is *generally* done, or what the *average* [physician] would do."[8]

¶13.    This case does not present a "battle of the experts." But we must draw attention to the fact that Dr. Davey—Glenn's designated testifying expert—is board-certified only in "wound care" and nothing else, and certainly not internal medicine. Dr. Davey was ineligible to be board-certified in internal medicine because he had not completed the required internal-medicine residency program. Dr. Reddix—Dr. Peoples's designated testifying expert—is, however, board-certified in internal medicine and he devotes his medical practice solely to this area. But for purposes of this analysis, we will assume that Dr. Davey does in fact meet the necessary qualifications to testify as an "expert" regarding issues of internal medicine.

¶14.    Both doctors articulated the same standard of care for the treatment of DVT or recurrent DVT—which was Aldridge's diagnosis at the time Dr. Peoples prescribed Coumadin. Specifically, the doctors agreed that the standard treatment was anticoagulation therapy—typically with Lovenox and Coumadin—unless there were "contraindications to anticoagulation," or more simply put, unless medical tests indicated the risk of bleeds became too high. According to the experts, to properly determine whether contraindications to anticoagulation exist, a treating physician should conduct a risk-benefit analysis.

¶15.    Where the experts differed was on the issue of whether Dr. Peoples had breached the standard of care, that is, whether Dr. Peoples had acted negligently in prescribing Coumadin to Aldridge. Dr. Davey conceded that opinions can differ regarding whether the risks

---

[8] ***Braswell***, 99 So. 3d at 179.

outweigh the benefits, and he did not deny that Dr. Peoples had followed the standard of care by conducting the risk-benefit analysis. Despite this, Dr. Davey maintained that the risk factors concerning Aldridge's medical condition weighed too heavily against the possible benefits to be gained by the Coumadin, and that any opinion to the contrary was a breach of the standard of care.

¶16.    Drs. Reddix and Peoples argued the opposite—asserting that Dr. Peoples had carefully considered all of the risk factors, conducted the appropriate tests ruling out some of the risks, weighed the multitude of benefits, and then ultimately had decided that the benefits gained substantially outweighed the risks—and that as a result, no breach had occurred.

¶17.    Because we are required to view the evidence in the light most favorable to the nonmoving party—which in the case would be Glenn—we hold that there remains a genuine issue of fact as to whether Dr. Peoples breached the standard of care by prescribing Coumadin to Aldridge. But the inquiry does not end here.

### B.    *Proximate Causation*

¶18.    No citation of authority is necessary for the well-understood principle of negligence law that a plaintiff may not recover without demonstrating that the defendant's negligence was a proximate cause of the plaintiff's damages. And "[i]n order for an act of negligence to proximately cause the damage, the fact finder must find that the negligence was both the cause in fact and legal cause of the damage."[9]

---

[9] ***Glover ex rel. Glover v. Jackson State Univ.***, 968 So. 2d 1267, 1277 (Miss. 2007) (citing Dobbs, *The Law of Torts*, § 180 at 443 (2000).

¶19.   A defendant's negligence is the cause in fact "where the fact finder concludes that, but for the defendant's negligence, the injury would not have occurred."[10]  In other words, "the cause in fact of an injury is 'that cause which, in natural and continuous sequence unbroken by any efficient intervening cause, produces the injury and without which the injury would not have occurred.'"[11]  When a plaintiff's injuries are the result of the negligence of more than one tortfeasor, the test is "whether the negligence of a particular tortfeasor was a substantial factor in bringing about the harm."[12]  Further, "a defendant's negligence which is found to be the cause in fact . . . will also be the legal cause . . . provided the damage is the type, or within the classification, of damage the negligent actor should reasonably expect (or foresee) to result from the negligent act."[13]

¶20.   Dr. Peoples correctly argues that Glenn failed to put forth sufficient evidence to create a genuine issue of material fact as to whether Dr. Peoples's act of prescribing Coumadin—even assuming for the sake of this argument that it was a negligent act—*proximately caused* Aldridge's injuries.  This clearly is demonstrated in the record before us.

¶21.   Even if we were to assume that the ingestion of Coumadin alone caused Aldridge's hemorrhagic stroke—an assumption it may not at all be safe to make—still, Glenn presented

---

[10] *Id.*

[11] *Id.* (citing *Gulledge v. Shaw*, 880 So. 2d 288, 293 (Miss. 2004)).

[12] *Id.* at 1291 n.11 (citing Dobbs, *The Law of Torts*, § 171 at 415 (2000)).

[13] *Id.*  (citing Dobbs, *The Law of Torts*, § 180 at 443 (2000)).

no evidence that the Coumadin Aldridge was taking at the time of her stroke was in fact prescribed by Dr. Peoples. The "duration of action" for Coumadin—according to the general knowledge of the doctors and the manufacturer's informational packet accompanying the drug—ranges from two to five days. Dr. Peoples discharged Aldridge from his care on April 30, 2010, and accordingly, any Coumadin that he prescribed would have run its course by May 6, 2010, at the latest. Aldridge suffered her stroke nearly two months later, on June 25, 2014. Thus, her stroke cannot be attributed to the Coumadin prescribed by Dr. Peoples.

¶22. Indeed, all of the evidence presented shows that, for the nearly two-month period preceding Aldridge's stroke, Dr. Jones issued the orders prescribing Coumadin. And Glenn presented no evidence to indicate that Dr. Jones's decision to prescribe the drug was based on anything other than his own *independent* judgment. In fact, Plaintiff's expert Dr. Davey even conceded this much when he testified as follows:

> Q. And in seeing the patients in the nursing home, do you monitor what medicines they take?
> A. Absolutely. That's very important.
> Q. And do you make decisions as to what medicines they should be on?
> A. Of course. . . .
> Q. Dr. Davey, if a patient is transferred into your care at a nursing home, do you evaluate the medicines that they're on when they're transferred into your care?
> A. Yes. It's actually very common . . . so, I do evaluate them and cut their medication list down to a smaller number if it's at all possible, which it usually is.
> Q. When patients are transferred into your care in a nursing home, do you have to report to their primary care physician?
> A. No. . . . generally there would then be no contact.

¶23. Dr. Davey further testified:

Q. . . . When Dr. Jones took over Ms. Aldridge's care, did he have a responsibility to make sure that it was appropriate for her to be on Coumadin?

A. I think so, yes. . . .

Q. . . . he also had a responsibility from a medical standpoint to make sure that was appropriate, correct?

A. Right. He could have disagreed with Dr. Peoples.

Q. And that would been his call to make, correct?

A. Yes. . .

Q. So as of 5-24-2010, the order for Ms. Aldridge to continue Coumadin came from Dr. Jones, didn't it?

A. . . . yes, he – by that time, he's the one signing off on it. . . .

Q. Dr. Jones had an obligation to make the determination of Coumadin was safe, correct?

A. Yes, that's true.

¶24. Consistent with this testimony—by the plaintiff's own expert—it was Dr. Jones's responsibility to provide Aldridge's medical care, including the prescription of any medicines. And for nearly two months, Dr. Jones, *not* Dr. Peoples. prescribed Coumadin for Aldridge. Logically, it follows that, if Coumadin alone caused Aldridge's stroke, then the cause would be attributed to negligent prescription by Dr. Jones, *not* Dr. Peoples.

¶25. Dr. Davey—again, Plaintiff's own expert—opined that the stroke—or brain bleed—was caused by, or the result of Aldridge's INR level being toxic at 3.7, or in other words, that her blood had been allowed to become too thin. Dr. Davey conceded that Aldridge's INR level was not toxic when she was discharged by Dr. Peoples in April 2010. And after her discharge from Dr. People's care, Aldridge's INR levels were monitored by Dr. Jones, not Dr. Peoples. On this issue, Dr. Davey testified as follows:

Q. I'll ask you this. Her INR level when she was discharged from St. Dominic wasn't toxic, was it?

A. I don't know. I doubt they would have discharged her with a high INR, but I don't know.

10

Q. Is 1.79 toxic?
A. No.

¶26. Further, Dr. Davey acknowledged that Aldridge did not have a brain bleed after being in Dr. Peoples's care by the following exchange:

Q. So by the time Ms. Aldridge was transferred into Dr. Jones' care she did not have a brain bleed, correct?
A. Apparently not.

¶27. Dr. Davey's testimony then continued to indicate that it was the negligent monitoring of Aldridge's Coumadin intake and her corresponding INR levels which *caused* and eventually led to the hemorrhagic stroke. On this issue, Dr. Davey testified as follows:

Q. And then you say it was poorly monitored, and I think we've already addressed this, but if that's true, then that was not Dr. Peoples' fault in this case, was it?
A. The poor monitoring would have been. . . in the nursing home . . . .
Q. And we can't say as we sit here today that if INR level would have been between two and three she still would have had a brain bleed, can we?
A. Of course, true. . . .
Q. So can you say within a reasonable degree of medical certainty that this brain bleed would have occurred even if the Coumadin was properly monitored?
A. It was less likely. . . .
Q. So then – and I don't mean to belabor the issue, you can't say within a reasonable degree of medical certainty that had her Coumadin been controlled that she would have bled out, correct?
A. Right. . . .

¶28. And Dr. Davey later testified:

Q. But as to the monitoring, your criticism goes to Dr. Jones and/or Trinity, correct –
A. Well –
Q. – assuming 5-30 was the last –
A. – as we've discussed, yes. I mean, I agree with what we've discussed and – about the monitoring of the INR. . . .

11

Q. Sure.

A. . . . I agree with you.

¶29. So, based on Plaintiff's proffered expert testimony, the mere ingestion of Coumadin was not the culprit. Instead, Aldridge suffered a hemorrhagic stroke because her INR levels had been allowed to become toxic—and this was *caused* by Dr. Jones's failure to properly monitor the Coumadin intake and INR levels. Based on the foregoing discussion, we are of the opinion that Glenn failed to meet her burden as to the element of proximate causation.

## CONCLUSION

¶30. In sum, Glenn failed to present sufficient evidence to create a genuine issue of material fact regarding causation, and the trial court, therefore, properly granted Dr. Peoples's motion for summary judgment. So, we affirm the judgment of the Hinds County Circuit Court.

¶31. **AFFIRMED**.

**RANDOLPH, P.J., LAMAR, PIERCE AND COLEMAN, JJ., CONCUR. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J. WALLER, C.J., NOT PARTICIPATING.**

**KITCHENS, JUSTICE, DISSENTING:**

¶32. Because a genuine issue of material fact remains in this case, namely whether Dr. Peoples proximately caused Mattie Aldridge's death through his negligent prescription of Coumadin, I respectfully dissent.

¶33. In our examination of a lower court's grant of summary judgment, this Court employs a *de novo* standard of review. ***Anglado v. Leaf River Forest Prods.***, 716 So. 2d 543, 547 (¶

12

13) (Miss. 1998). Rule 56 of our Rules of Civil Procedure provides the basis for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

M.R.C.P. 56(c). This Court will consider all of the evidence before the trial court in the light most favorable to the nonmoving party. ***Palmer v. Anderson Infirmary Benevolent Ass'n***, 656 So. 2d 790, 794 (Miss. 1995). The party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." M.R.C.P. 56(e).

¶34.    To establish a *prima facie* case of medical malpractice, the plaintiff must show that:

> (1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury, and; (4) the plaintiff was injured as a result.

***Delta Reg'l Med. Ctr. v. Venton***, 964 So. 2d 500, 504 (¶ 8) (Miss. 2007).

¶35.    It is clear that Tamara Glenn, the executrix of Mattie Aldridge's estate, has established that Dr. Peoples owed Aldridge the duty to provide her reasonable and ordinary medical care. Further, there exists a genuine issue of material fact about whether Dr. Peoples breached his duty of ordinary care by prescribing Coumadin to Aldridge. Therefore, our analysis must address whether there is a genuine issue of material fact concerning whether Dr. Peoples proximately caused Aldridge's injuries.

¶36. The majority posits that Glenn has offered no proof that the Coumadin in Aldridge's system was prescribed by Dr. Peoples. In so doing, the majority either overlooks or misinterprets the relevant facts and circumstances. According to the majority, Dr. Peoples claims that the Coumadin in Aldridge's system at the time of her stroke was prescribed by Dr. Jones, thereby relieving Dr. Peoples of liability. But Dr. Peoples has put forth no evidence that Dr. Jones's prescription of Coumadin was based on Dr. Jones's independent medical judgment and did not result from deference to Dr. Peoples's hospital discharge orders. Instead, the majority relies on Dr. Peoples's rhetorical argument that Dr. Jones *could* have exercised independent judgment over Aldridge's Coumadin prescription. The record establishes that Dr. Peoples was the physician with primary responsibility for Aldridge's vascular care. This is evidenced by her followup appointment with Dr. Peoples in 2008 after her ischemic stroke, his treatment of her 2010 blood clot, his treatment of her 2010 hemorrhagic stroke, and his treatment of her 2010 "asthma exacerbation." It also is apparent from the discharge order that Dr. Peoples knew that other physicians at St. Dominic had determined that Aldridge should never again be given blood thinners, because she was not an appropriate candidate for this kind of medication. Moreover, as Glenn argues in her brief, it is clear from Dr. Peoples's discharge order that, while he intended for Aldridge to be taken off Lovenox when her blood consistency stabilized, he intended for her to remain on Coumadin indefinitely. Moreover, given that Dr. Peoples had primary responsibility for Aldridge's vascular care through his treatment of her during significant, traumatic events requiring hospitalization, it is reasonable to infer that Dr. Jones would be deferential to Dr.

14

Peoples's judgment concerning Aldridge's medication for treatment of her vascular disease. There is no proof in the record that Dr. Jones's continued administration of Coumadin was based on his independent judgment. At the same time, there is no evidence to refute the likelihood that Dr. Jones was acting in compliance with Dr. Peoples's hospital discharge order, which stipulated that Mattie Aldridge should remain on Coumadin indefinitely. Conversely, if Dr. Jones had deviated significantly from Dr. Peoples's discharge order, Dr. Peoples would be in a position to argue that he was not responsible for the consequent damages, because Dr. Jones had not been deferential to his discharge orders. Sufficient issues of fact remain in this case to survive summary judgment regarding whether Dr. Peoples's Coumadin prescription was the proximate cause, or a proximate contributing cause, of Aldridge's death.

¶37. Dr. Peoples argues that, even if he was negligent in prescribing Coumadin, he was relieved of any liability through the superseding cause of Dr. Jones's negligence in monitoring Aldridge during her stay at Trinity Rehabilitation. Dr. Peoples contends that it was unforeseeable that Dr. Jones would stop testing Aldridge's blood consistency while she was taking Coumadin. However, his discharge order required that Dr. Jones test Aldridge's blood to determine when she should discontinue Lovenox. There is no mention of continued testing to monitor Aldrdige's use of Coumadin. Dr. Peoples, in essence, is complaining that Dr. Jones adhered to Dr. Peoples's hospital discharge orders.

¶38. Even assuming that Dr. Peoples had recommended daily testing of Aldridge's blood's consistency in his discharge order or that the standard of medical care required Dr. Jones to

15

test Aldridge's blood daily and he negligently failed to do so, Dr. Peoples is not relieved of liability based on Dr. Jones's subsequent negligence. A tortfeasor's proximate liability is not extinguished by an "intervening force," meaning that a tortfeasor still is liable if another force or third party "actively operates in producing harm to another after the actor's negligent act or omission has been committed." *Restatement (Second) of Torts* § 441 (1965). The bright-line standard for determining whether another actor's negligence is an intervening force, and therefore does not relieve the original tortfeasor of liability, is whether it is foreseeable. ***Canton Broiler Farms, Inc. v. Warren***, 214 So. 2d 671, 676-77 (Miss. 1968) ("[I]f foreseeable, the subsequent negligence is not independent and intervening, but is concurrent with the prior negligence."); ***Meridian Hatcheries Inc. v. Troutman***, 230 Miss. 493, 509, 93 So. 2d 472, 476 (1957) ("We believe the rule to be that where the act of a third party, even if it is negligent, intervenes between the original negligence of defendant and the injury, there is proximate cause if, under the circumstances, an ordinarily prudent man could or should have anticipated that such intervening act, or a similar intervening act, would occur."). This Court has adopted a broad definition of *foreseeability*, holding that things are foreseeable if they are "not unforeseeable." ***Billups Petroleum Co. v. Entrekin***, 209 Miss. 302, 313, 46 So. 2d 781, 784 (1950) ("It is no defense that the liability is seen to extend beyond the risk. . . . The test is not always whether an intervening or activating cause is foreseeable if it be not unforeseeable.").

¶39. The Restatement (Second) of Torts attempts to draw a dividing line by shielding a defendant from liability if the intervening force can be classed as a "superseding cause." *See*

16

*Restatement (Second) of Torts* § 440 (1965). The Restatement defines a superseding cause as:

> [A]n act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.

*Id.*

¶40. The Restatement articulates six factors, which this Court adopted in ***Southland Management Company v. Brown***, 730 So. 2d 43 (Miss. 1998), to consider in determining whether a particular intervening force can be considered a superseding cause:

> (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
>
> (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
>
> (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
>
> (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
>
> (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Id.* at 46 (quoting *Restatement (Second) of Torts* § 440 (1965)).

¶41. A fair analysis of these factors, taken in the light most favorable to Glenn, the party against whom summary judgment was granted, is: (a) A hemorrhagic stroke is exactly the

17

type of harm that would be caused by prescribing Coumadin to a person who was medically unsuited for this prescription. This factor weighs in favor of foreseeability. (b) Given that the warning label cautions about Coumadin causing excessive bleeding, bleeding in the brain would be an ordinary and expected consequence of a physician's negligently prescribing Coumadin, which Aldridge's expert confirmed. This factor weighs in favor of foreseeability. (c) Dr. Jones's need to monitor Aldridge's blood consistency was a consequence brought about by Dr. Peoples's allegedly negligent prescription of Coumadin. This factor weighs in favor of foreseeability. (d) According to Dr. Peoples, Aldridge's death was caused by Dr. Jones's failure to monitor the patient appropriately. This factor weighs against foreseeability and in favor of finding Dr. Jones's negligence to have been a superseding cause. (e) Although Dr. Jones may have been negligent, it cannot be argued that his actions were purposefully wrongful or malicious. This factor weighs in favor of foreseeability. (f) Dr. Jones would not be criminally culpable for this act. It cannot even be argued that his act was "foolhardy" or "malicious." *See Brown*, 730 So. 2d at 47. This factor weighs in favor of foreseeability. (The items (a) through (f) correspond with the factors stated in the Restatement.) In the light most favorable to Glenn, only one factor — "the intervening force is due to a third person's act or to his failure to act"— weighs in favor of Dr. Peoples's argument that Aldridge's death was not a foreseeable consequence of his negligent prescription of Coumadin. By contrast, in *Brown*, the Court held that the defendant had to prove all six factors to establish superseding cause as a matter of law. *See id.*

¶42. Ultimately, because genuine issues of material fact remain with regard to whether Dr. Peoples proximately caused Aldridge's death through his negligent prescription of Coumadin, I respectfully dissent.

**KING, J., JOINS THIS OPINION.**