# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CT-01777-SCT

*JOE McGINTY AND DIANE McGINTY*

*v.*

*GRAND CASINOS OF MISSISSIPPI, INC. - BILOXI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 09/21/2012 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| TRIAL COURT ATTORNEYS: | CRYMES M. PITTMAN |
| | TAYLOR B. McNEEL |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | BRANDI DENTON GATEWOOD |
| | DAVID NEIL McCARTY |
| ATTORNEYS FOR APPELLEE: | TAYLOR B. McNEEL |
| | R. DAVID KAUFMAN |
| | JULIE JARRELL GRESHAM |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED IN PART AND REVERSED IN PART AND REMANDED - 06/14/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.    Joe and Dianne McGinty sued Grand Casinos of Mississippi Inc.-Biloxi alleging

negligence and breach of implied warranty of merchantability for serving unfit food. The

trial court granted summary judgment in favor of Grand Casinos of Mississippi Inc.-Biloxi as to both claims. The Court of Appeals affirmed the trial court's grant of summary judgment as to the negligence claims, but reversed the trial court's grant of summary judgment as to the breach-of-implied-warranty claims. We granted certiorari. We affirm the judgment of the Court of Appeals, and we affirm in part and reverse in part the judgment of the circuit court.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2. According to their depositions, on September 20, 2004, Joe and Dianne[1] McGinty ate breakfast and a snack at their home in Brandon, Mississippi. That evening, they ate dinner at LB's Steakhouse[2] in Gulfport, Mississippi. They each had prime rib and a glass of wine with dinner. They then drove to the Grand Casinos of Mississippi, Inc.- Biloxi (Grand Casinos) in Biloxi, Mississippi. They gambled for several hours and drank more wine; however, they did not eat any more food. They went to bed between 10:00 p.m. and midnight.

¶3. The McGintys awoke early the next morning and ate breakfast at 5:30 a.m. at the Island View Café inside the Grand Casinos. Mr. McGinty ordered "Mama's Eggs and Chops," which included two grilled pork chops. Mr. McGinty took a bite of the pork chop and "didn't like it." Therefore, Mrs. McGinty finished the remainder from his plate.

---

[1]Dianne McGinty's name for the case filing is spelled "Diane." However, her deposition provided the spelling is "Dianne."

[2]The trial court explained that, prior to Hurricane Katrina, LB's Steakhouse was located in Gulfport, not Biloxi.

2

¶4.    Mr. McGinty testified that "somebody dropped the ball with . . . that meat that we had." Counsel then asked, "Why do you think it was the meat?  And when I'm talking about the meat, I'm talking about the pork chop."  Mr. McGinty stated, "Because it tasted bad." On the other hand, Mrs. McGinty did not remember the pork chops "tasting funny."  Mr. McGinty also was asked: "Do you think it's possible that you could have eaten somewhere – something else that did not – was not at Grand Casinos that caused you and [Dianne] to get sick?"  Mr. McGinty replied, "No."  When asked why he thought that, he stated:

> Because of the length of time that – it was the only thing I had eaten was up at the other Grand.  So it was either – that prime rib, they – they're famous for – they were famous for prime rib.  And the only thing that we had eaten was the next morning, and it tasted bad.  You know, when you – it looked good, but it just tasted bad.

¶5.    After breakfast, the McGintys rode in a limousine provided by the Grand Casinos to New Orleans, Louisiana. They each drank only water in the limousine.  However, in the limousine, Mrs. McGinty began to feel nauseated, and she experienced diarrhea at the airport. They then caught a flight to Los Angeles, California.  About an hour into the flight, Ms. McGinty began vomiting.  Mr. McGinty also fell ill.  He began to sweat profusely, feel nauseous, and become incontinent.  The flight attendants gave him oxygen and moved the couple to the back of the plane.  Mr. McGinty vomited and had diarrhea as well.  The McGintys did not eat or drink anything on the airplane.

¶6.    When the plane landed in Los Angeles, Mr. McGinty was carried off the airplane on a stretcher by emergency medical technicians.  The McGintys were transported to a local hospital by ambulance.  On the way to the hospital, Mrs. McGinty began to vomit a large

3

amount of blood. At the hospital, she received two blood transfusions and was treated for an esophageal tear. Mr. McGinty was discharged from the hospital the same day, but Mrs. McGinty stayed in the hospital for three days. Mrs. McGinty stated no tests were conducted for food poisoning at the hospital.

¶7. Upon returning home, Mrs. McGinty saw her general doctor. Prior medical records from her general doctor show Mrs. McGinty had a history of digestive problems. Two months before the alleged food poisoning, her medical records noted that she suffered from "abdominal pain within 30 minutes after eating which is chronic/recurring frequently, . . . [c]rampy/colicky abdominal pain, diarrhea 15-30 minutes after eating which is chronic." Further, Mrs. McGinty's medical records show that she had vomited blood in March 2003, which also occurred prior to the alleged food poisoning.

¶8. On October 18, 2004, Dr. Jerome Helman, Mrs. McGinty's treating physician from the California hospital, wrote a letter to Mrs. McGinty and enclosed her medical reports. In the letter, Dr. Helman stated Mrs. McGinty's "upper gastrointestinal bleeding was caused by the severe vomiting, which related to food and drink [she] had prior to the event."

¶9. On September 13, 2007, the McGintys filed suit in Harrison County Circuit Court against Grand Casinos for negligence and breach of the implied warranty of merchantability. In January 2012, Grand Casinos filed a motion for summary judgment, arguing the McGintys could not meet their burden of proof to establish a food-poisoning claim under Mississippi law. Grand Casinos argued the McGintys had failed to present lab analyses proving their

4

illnesses were caused by tainted food eaten at Grand Casinos, and they had failed to offer sufficient medical-expert testimony on causation.

¶10. The trial court granted Grand Casinos' motion for summary judgment. The McGintys appealed. The Court of Appeals held the trial court's judgment, as it pertained to the McGintys' negligence claims, was proper because there was no genuine issue of material fact as to whether Grand Casinos had breached its duty of care. The Court of Appeals then reversed the trial court's judgment with respect to the breach-of-implied-warranty claims, holding sufficient evidence was presented to allow a jury reasonably to infer the food consumed by the McGintys at the Island View Café caused their illnesses. Grand Casinos filed a petition for certiorari, and we granted it.[3]

## STATEMENT OF THE ISSUES

**(1)** **Whether summary judgment was properly granted on the McGintys' negligence claim.**

**(2)** **Whether summary judgment was properly granted on the McGintys' breach-of-implied-warranty-of-merchantability claim.**

## STANDARD OF REVIEW

¶11. With a summary-judgment motion, the mover bears the initial burden of supporting the motion for summary judgment. Miss. R. Civ. P. 56. "When a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations

---

[3]After we granted certiorari, Caesars Entertainment Operating Company, Inc., including its affiliate Grand Casinos of Mississippi, Inc., filed for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court for the Northern District of Illinois. On February 17, 2015, this Court stayed the appeal pursuant to 11 U.S.C. § 362(a). On January 23, 2018, this Court lifted the stay for purposes of this appeal, based upon an agreed order entered by the bankruptcy court.

or denials of his pleadings, but his response . . . must set forth specific facts showing that there is a genuine issue for trial." Miss. R. Civ. P. 56.

¶12.   Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). In other words, summary judgment is appropriate where the nonmoving party fails to "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Buckel v. Chaney*, 47 So. 3d 148, 153 (Miss. 2010). The evidence is reviewed in the light most favorable to the nonmoving party, and the Court reviews the grant or denial of summary judgment de novo. *Bennett v. Hill-Boren, P.C.*, 52 So. 3d 364, 368 (Miss. 2011).

## ANALYSIS

**(1)   Whether summary judgment was properly granted on the McGintys' negligence claim**.

¶13.   The trial court and the Court of Appeals placed great weight on *Goodwin v. Misticos*, 42 So. 2d 397 (Miss. 1949). In *Goodwin*, Mr. Goodwin, a restaurant patron, became ill within a few hours of eating corned beef. *Goodwin*, 42 So. 2d at 397. Mr. Goodwin later was diagnosed with ptomaine poisoning and died as a result of his illness. *Id.* Mr. Goodwin's wife, Mrs. Goodwin, sued the restaurant for negligence. *Id.* at 397-98.

¶14.   Mrs. Goodwin presented testimony regarding Mr. Goodwin's eating habits on the day he ate the corned beef. *Id.* at 398. She also testified that her corned beef did not "taste right,"

6

but Mr. Goodwin did not complain about his corned beef. *Id.* Further, she stated he became sick shortly after eating the corned beef. *Id.* Dr. Copeland testified "that ptomaine poisoning . . . is a bacterial infection of the alimentary canal, carried there generally by eating food, drinking water, or something." *Id.* at 402. The trial court granted a directed verdict in favor of the restaurant. *Id.* at 399.

¶15. On appeal, the *Goodwin* Court considered what reasonable inferences could be drawn based on the proof presented. *Id.* at 400-03. The *Goodwin* Court stated, "[N]o such inference upon inference will be permitted to prevail when the fact sought to be established by such inference upon inference is capable of more satisfactory proof by direct, or positive or demonstrative, evidence, within the reasonable power of the party holding the burden to produce." *Id.* at 402. The *Goodwin* Court then analyzed the proof presented and what reasonable inferences could be drawn. It stated, "From the proof the jury could reasonably find: (1) That Mr. Goodwin ate the corned beef; (2) in one and one-half hours he became ill; and (3) from these two proven facts the jury could reasonably infer there was a germ in the corned beef that made him sick." *Id.* at 402. The *Goodwin* Court then concluded what could not be reasonably inferred: " We cannot from this inference draw another inference that the bacteria got into the food or drink as a result of the negligence of the restaurateur." *Id.* at 403. Therefore, the *Goodwin* Court affirmed the trial court's judgment. *Id.*

¶16. Here, the McGintys presented proof of the following: (1) they ate a pork chop at a Grand Casinos' restaurant, and Mr. McGinty testified it tasted bad; (2) hours after tasting the pork chop, they experienced vomiting and diarrhea; and (3) more than three weeks after they

7

experienced these symptoms, a physician wrote Mrs. McGinty a letter, stating her prior symptoms were "related to food and drink [she] had prior to the event." The McGintys maintain that the instant proof establishes the causal connection required in a negligence suit.

¶17. However, based on the proof presented, the connection between the alleged contaminated pork chop and the illness and that the alleged contaminated pork chop was *the result of* Grand Casinos' action cannot be reasonably inferred. In other words, as in *Goodwin*, the McGintys have failed to make a prima facie case for negligence. *Goodwin*, 42 So. 2d at 403.

¶18. Thus, we agree with the Court of Appeals that the evidence presented was insufficient to support the McGintys' claim of negligence. Accordingly, the Court of Appeals correctly affirmed the trial court's grant of summary judgment in favor of Grand Casinos on the McGintys' negligence claim(s).

> **(2)** **Whether summary judgment was properly granted on the McGintys' breach-of-implied-warranty-of-merchantability claim.**

¶19. An implied warranty of merchantability "provides that when a sale of goods is made, there is an implied warranty that the goods are merchantable if the seller is a merchant with respect to goods of that kind." *Watson Quality Ford, Inc. v. Casanova*, 999 So. 2d 830, 833 (Miss. 2008) (internal quotation omitted). The elements of an implied-warranty claim are the following:

> (1) That a "merchant" sold "goods," and he was a merchant with respect to "goods of the kind" involved in the transaction, (2) which were not merchantable at the time of the sale, and (3) injuries and damages to the plaintiff or his property, (4) caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of the injury.

8

*Vince v. Broome*, 443 So. 2d 23, 26 (Miss. 1983).

¶20.    In implied-warranty claims for nonmerchantable food, the cases turn on whether the evidence presented emerges from speculation and allows a reasonable inference to be drawn. *See John Morrell & Co. v. Shultz*, 208 So. 2d 906 (Miss. 1968); *Newton Coca-Cola Bottling Co. v. Shaw*, 112 So. 2d 374, 375 (Miss. 1959); *Goodwin*, 42 So. 2d at 400.   The Court of Appeals held that the that the evidence presented did create a jury question as to whether defective pork chops caused the McGintys' illnesses.   *McGinty v. Grand Casinos of Mississippi*, *Inc.- Biloxi*, No. 2012-CA-01777-COA, 2014 WL 1887548, *9 (Miss. Ct. App. May 13, 2014).   We agree.

¶21.    As explained above, *Goodwin* provides guidance for food-poisoning cases; however, *Goodwin* was a negligence case.   In fact, *Goodwin* distinguished itself from a breach-of-implied-warranty case, stating, "It will be observed that this suit is not framed on any implied warranty . . . ." *Goodwin*, 42 So. 2d at 398.    However, as the Court of Appeals did, we look to *Goodwin* to begin our reasonable-inference analysis.   Even in an implied-warranty case, *Goodwin* provides guidance regarding the dividing line between the proof needed for a negligence case versus the proof needed for an implied-warranty case.

¶22.    As stated above, the *Goodwin* Court analyzed the proof presented and what reasonable inferences could be drawn.   It stated, "From the proof the jury could reasonably find:  "(1) [t]hat Mr. Goodwin ate the corned beef; (2) in one and one-half hours he became ill; and (3) from these two proven facts the jury could reasonably infer there was a germ in the corned beef that made him sick." *Id.* at 402.   The *Goodwin* Court then stated what could

not be reasonably inferred, "[w]e cannot from this inference draw another inference that the bacteria got into the food or drink as a result of the negligence of the restaurateur." *Id.* at 403. Notably, this final, unreasonable inference is *not* an element of a breach-of-implied-warranty claim.

¶23.   Here, the McGintys presented evidence that (1) the pork chop "tasted funny," (2) a doctor opined that the illness was "related to food or drink,"[4] (3) the McGintys drank only water between eating the pork chop and becoming ill,  (4) the McGintys both ate the same food and both became sick around the same time, and (5) the time between ingesting the pork chops and their illnesses was short in duration.  With similar information, the *Goodwin* Court concluded a reasonable inference could be drawn by the jury that Mr. Goodwin got sick from the corned beef.  *Id.* at 401; *see also* ***Masonite Corp. v. Hill***, 154 So. 295, 299 (Miss. 1934). Although, as mentioned above, *Goodwin* did not address a breach-of-implied-warranty claim, its guidance regarding reasonable inferences cannot be ignored.   Therefore, *Goodwin* supports the McGintys' argument that they have presented enough evidence to survive summary judgment on their breach-of-implied-warranty claim.

---

[4]While Grand Casinos argued the content of the letter was wholly insufficient for summary-judgment purposes, the form of the letter, as summary-judgment evidence, was not specifically objected to.   Therefore, we refrain from considering whether it constitutes proper summary-judgment evidence, as the content of the evidence—the treating physician's opinion—could be admissible at trial, *if properly presented*. ***Illinois Cent. R. Co. v. Jackson***, 179 So. 3d 1037, 1043 (Miss. 2015) ("To be exact, the content of summary-judgment evidence must be admissible at trial although the evidence may be in a form, such as an affidavit, that would not be admissible.").   In other words, we offer no opinion as to admissibility of the document as to form, because without Grand Casino's objection to the form, *it is waived*.

¶24. Before we conclude, we think it pertinent to address the several cases within Mississippi that touch upon the issues before the Court today. Because the cases either support the holding we reach today or are distinguishable, we conclude summary judgment is not warranted for the breach of implied warranty claim.

¶25. First, in **John Morrell & Co. v. Shultz**, 208 So. 2d 906 (Miss. 1968),[5] the plaintiff sued[6] alleging that she became ill "as the consequence of eating a can of potted meat." **Shultz**, 208 So. 2d at 906. After receiving a jury verdict in support of the plaintiff, the packing company appealed. The Court considered the evidence presented at trial and reversed the verdict.[6] Here, **Shultz** does not provide guidance, as it is distinguishable from the instant case for two main reasons. In **Shultz**, at trial, there was no testimony that the potted meat tasted or smelled strangely. Further, here there is also the added element that both the McGintys became ill after eating from the same pork chop.

¶26. Second in, **Armour & Co. v. McMillain**, 155 So. 218 (Miss. 1934), the manufacturer of the sausage was sued under a breach-of-warranty claim when the plaintiff became sick from eating the sausage. **McMillain** went to trial before an appeal. **McMillain**, 155 So. at 219. The main issue on appeal in **McMillain** was whether the manufacturer or the grocer (who opened the can and served it to customers) was at fault. **Id.** at 218. Thus, **McMillain**

---

[5]The opinion is not clear whether the claim was negligence or a breach of the implied warranty.

[6]We think it pertinent to point out that, while the Mississippi District Court cases cited *infra* were faced with summary judgment motions, the Supreme Court cases addressed evidence presented at trial. Therefore, the summary judgment burden and lack of objection to the form, as is the case here, was not an issue.

11

too is distinguishable from the instant case. Stated differently, the issue was not whether fault could be established for the allegedly defective sausage, but who—of two possible defendants—was at fault. While the question of who was at fault would not have been presented without first establishing that food poisoning *caused* the plaintiff's illness, *McMillain* did not address cause.[7] Thus, because causation was never an issue, judicial notice could have been taken of the contamination, and *McMillain* is unclear from where causation did arise, *McMillain* is materially distinguishable from the instant case and is not instructive.

¶27. Third, although not binding, we consider how Mississippi district courts have treated alleged food-poisoning cases. In *Doss v. NPC Int'l, Inc.*, No. 4:09CV38, 2011 WL 754891 (N.D. Miss. Feb. 24, 2011), the plaintiffs sued under a negligence theory. We hold *Doss* distinguishable for three main reasons. Like in *Goodwin*, the theory of negligence automatically distinguishes *Doss* from the instant issue.[8] Further, the plaintiffs suffered differing and inconsistent symptoms. *Doss*, 2011 WL 754891, **2-3. Additionally, as in *Shultz*, the whole case turned on the plaintiffs' bald claims regarding the food poisoning and the doctors' opinions; opinions which were based on the history related by the plaintiffs. *Id.*;

---

[7] In 1934, the Court held: "That a can opener and ice pick, used in store to open cans and to remove contents and left exposed when not in use, could be contaminated by bacteria is so well known that *judicial notice may be taken* of the fact." *Cudahy Packing Co. v. Baskin*, 155 So. 217 (Miss. 1934) (emphasis added). *McMillain* relied on *Baskin* in its holding. *McMillain*, 155 So. at 219.

[8] The *Doss* Court stated, "The only other evidence presented in support of plaintiffs' *negligent preparation claim* is the statement by one of the plaintiffs that she identified something red in her chicken wings during consumption that she believed to be blood." *Doss*, 2011 WL 754891, at *2 (emphasis added).

12

***Shultz***, 208 So. 2d 906 (Miss. 1968). *See also **Forehand v. Ryan's Family Steak House, Inc.***, No. CIV.A.103CV672WJGJMR, 2005 WL 1523381 (S.D. Miss. June 28, 2005) (holding that merely the plaintiff's belief that the food was the source of his illness was not enough to survive summary judgment).

¶28.   More on point with the instant case is a Southern District case, ***L.W. ex rel. Ware v. Tyson Foods, Inc.***, No. 1:10CV330-LG-RHW, 2011 WL 3476574 (S.D. Miss. Aug. 9, 2011).   In ***Tyson Foods***, the plaintiff sued for breach of implied warranty after he became sick, allegedly from consuming hamburger meat. ***Tyson Foods, Inc.***, 2011 WL 3476574, at *2.   Another family member who consumed the meat became ill but did not seek medical attention. ***Id.***   The plaintiff sought medical attention, and his stool sample tested positive for bacteria. ***Id.***   Considering ***McMillain*** and ***Shultz***, the fact that more than one family member became ill, and the test from the doctor, the ***Tyson Foods*** Court denied the summary judgment motion, despite the plaintiff's past stomach problems. ***Id.*** at *3.   Given the guidance in ***Goodwin*** and the additional caselaw outlined above, we hold that the McGintys presented enough evidence to survive summary judgment on their breach-of-implied-warranty claim.   The evidence did not come in the form of a test, as in ***Tyson Foods***, but a test is not necessarily required where there is *additional* evidence.   Here, evidence was presented that the pork chop "tasted funny," a doctor's opinion that "the illness was related to food or drink," the fact that the McGintys drank only water between eating the pork chop and becoming ill and the fact that both of the McGintys became ill shortly after both eating from the same pork chop at the same time.

13

¶29.    The dissent argues that the instant holding places Mississippi more in line with Tennessee's summary judgment standard. Further, the dissent continually interchanges their argument as to the form (in which the McGintys presented the medical opinion) and the substance of the medical opinion.  We disagree on both points.  The form of the medical opinion was never objected to, and is therefore waived.  Further, the substance of the medical opinion is sufficient to withstand summary judgment.  Thus, the decision reached today is not based on what "will, or might be developed later in discovery–or at trial." *Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1274 (Miss. 2007).  It is based on the evidence before the court, and the collective effect of the evidence presented is enough for a jury reasonably to infer that the McGintys became ill from a defective pork chop. Therefore, while the evidence presented is not enough for a negligence claim, there is a line between a negligence claim and a breach of implied warranty claim, and this case, in the words of Johnny Cash, walks the line.

## CONCLUSION

¶30.    We hold summary judgment is proper on the McGintys' negligence claim.  Therefore, we affirm the Court of Appeals and the trial court regarding the negligence claim.  Further, we hold summary judgment is not proper for the McGintys' breach-of-implied-warranty claim.  Therefore, we affirm the Court of Appeals and reverse the trial court regarding the breach-of-implied-warranty claim. Lastly, we remand for further proceedings.

¶31.    **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED IN PART AND REVERSED IN PART AND REMANDED.**

**RANDOLPH AND KITCHENS, P.JJ., KING AND COLEMAN, JJ., CONCUR. BEAM, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J. MAXWELL AND ISHEE, JJ., NOT PARTICIPATING.**

**BEAM, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶32.　Respectfully, I dissent from the majority's decision to reverse the trial court's grant of summary judgment in favor Grand Casinos as to the McGintys' breach-of-implied-warranty claims. The McGintys have failed to present sufficient evidence the pork chop they claimed they ate in 2004 at Island View Café inside the Grand Casinos, was contaminated with poisonous bacteria and thus unfit for human consumption. Accordingly, I would hold their breach-of-implied warranty claims also fail as a matter of law.

¶33.　The only evidence presented in support of the McGintys' claim they both became ill from a contaminated pork chop is their deposition testimony and an unsworn letter from Dianne McGinty's treating physician in California that Dianne's illness was "related to food and drink." As Grand Casinos submitted in the trial court in support of its motion for summary judgment, this letter is wholly insufficient to establish the pork chop was "infect[ed]" with poisonous bacteria, as asserted in the McGintys' complaint.

¶34.　In every case cited by the majority in support of its decision, expert evidence was presented that the consumer's illness was caused by food poisoning. Such is necessary in this case, and none has been presented.

¶35.　In *Goodwin v. Misticos*, 42 So. 2d 397, 399-402 (Miss. 1949), the treating physician testified at trial that he diagnosed the patient's illness as "ptomaine poisoning," which he explained is a "bacterial infection of the alimentary canal," carried there by food or drink.

15

¶36.    In *Armour & Co. v. McMillain*, 171 Miss. 199, 155 So. 218, 219 (1934), the treating physician testified at trial the consumer's symptoms were caused from "acute botulism, or other food poison taken into the stomach when she ate the sausage."

¶37.    In *Cudahy Packing Co. v. Baskin*, 155 So. 217 (Miss. 1934), the consumer's treating physician testified that the consumer "was suffering from acute botulism, an illness caused by the eating of food containing the germ known as claustralian botulinus."

¶38.    And in *L.W. ex rel. Ware v. Tyson Foods, Inc.*, No. 1:10CV330-LG-RHW, 2011 WL 3476574, **2-3 (S.D. Miss. Aug. 9, 2011), the plaintiff was diagnosed with bacterial-born food poisoning, "campylobacter bacteria."

¶39.    Comparatively, in *Doss v. NPC International, Inc.*, No. 4:09 CV 38, 2011 WL 754891 (N.D. Miss. Feb. 24, 2011), the federal district court granted summary judgment in favor of the defendant after finding "the plaintiffs will be unable to establish that they were served food that was unfit for human consumption, based on the documents and exhibits before the court."  The district court said:

> Not one plaintiff was definitively diagnosed with food poisoning.  Rather, physicians diagnosed a few patients with possible food poisoning apparently based on the sole fact that symptoms included nausea and diarrhea and the patient's statements to physicians that they had been exposed to undercooked food.  To conclude that Plaintiffs suffered from gastroenteritis at the hands of undercooked food prepared by the Defendant would be speculative at best.  "It is well settled in . . . Mississippi that a verdict may not be based on surmise or conjecture and that to prove a possibility only is insufficient to make a jury issue." *John Morrell & Co.*, 208 So. 2d [906,] 907 (Miss. 1968) (citing *Berry v. Brant*, 252 Miss. 194, 172 So. 2d 398 (1965)).

*Doss*, 2011 WL 3476574, *3.

16

¶40.    The majority finds **Doss** distinguishable because there, the plaintiffs sued under negligence, not breach of implied warranty.  But as the majority implicitly recognizes, the only practical difference between the two theories is the duty-of-care element required for negligence, which is not required for implied warranty.  The causation requirement, however, is the same for both theories.

¶41.    Clearly, based upon the aforementioned finding(s) by the federal district court, the district court would have reached the same conclusion in favor of the defendant even if the plaintiffs had sued under implied warranty.

¶42.    Conversely, the same can be said with **Goodwin**, which–respectfully–both the majority and the Court of Appeals have completely misconstrued in this instance.  Having thoroughly read and considered **Goodwin**, there remains no question in my mind that had there not been expert evidence in the case affirmatively establishing that the consumer's illness was caused by food poisoning, the **Goodwin** Court would not have included any of its dicta in the opinion with regard to implied warranty.

¶43.    Here, similar to **Doss**, and unlike in **Goodwin**, **McMillian**, **Baskin**, and **L.W.**, neither of the McGintys was medically diagnosed with food poisoning.  For Joe, no medical information whatsoever relating to his alleged visit to the emergency room in California has been provided.  For Dianne, all we have is an unsworn letter from her treating physician saying she suffered from "upper gastrointestinal bleeding" that "was caused by the severe vomiting, . . . related to food and drink [she] had prior to the event."

¶44. Even if the letter was admissible as evidence (which it is not), no reasonable inference beyond speculation can be drawn from it that Dianne's illness was the result of food poisoning. And in turn, no inference can be drawn from Dianne's illness that the pork chop she ate contained harmful bacteria which rendered the food unfit for human consumption. Furthermore, the letter actually confirms (rather than excludes) what Dianne's prior medical records show, that she has experienced similar episodes in the past due to other ongoing medical conditions.

¶45. The majority, however, declines to address or consider this because it finds that: (1) Grand Casinos did not object to the "form" of the California physician's letter; and (2) "the content of the evidence–the treating physician's opinion could be admissible at trial, if properly presented." Respectfully, the majority is incorrect on each point.

¶46. Contrary to the majority's finding, Grand Casinos did object to the California physician's letter. Grand Casinos moved for summary judgment on the ground there is no sufficient medical expert evidence that the McGintys' alleged illnesses were caused by a tainted pork chop. In response, the McGintys offered the above-mentioned, unsworn letter from Dianne's treating physician in California. Grand Casinos replied, claiming the letter "is not even close to sufficient to establish that the pork chop 'was infected by poisonous bacteria[.]'" I completely agree.

¶47. While Grand Casinos bears the initial burden of supporting its motion for summary judgment, the McGintys retain the burden of proof throughout their implied-warranty cause of action. When the moving party does not bear the burden of proof at trial, the moving party

18

may satisfy its burden of production for Rule 56 purposes, by either (1) affirmatively negating an essential element of the nonmoving party's claim or (2) demonstrating the nonmoving party's evidence at the summary-judgment stage is insufficient to establish the nonmoving party's claim. *See, e.g., Galloway v. Travelers Ins. Co.*, 515 So. 2d 678, 684 (Miss. 1987) (holding that Rule 56 embodies the same concepts explained by *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), in construing Federal Rule of Civil Procedure 56)).

¶48.  Grand Casinos fully met Rule 56's second alternative (the *Celotex* standard), by demonstrating the California physician's letter is insufficient to establish the pork chop Dianne ate was infected with poisonous bacteria.

¶49.  The majority, however, treats the deficiencies of the California physician's letter as a matter of form that should not yet be considered for summary-judgment purposes. Ostensibly–and I truly hope this is the case, for the sake of restauranteurs and the like in Mississippi–the majority finds so on the expectation that more is to come from the treating physician in California.

¶50.  But while I hope this is the majority's ultimate position, the majority nevertheless departs from this Court's precedent in so holding. In *Glover v. Jackson State University*, 968 So. 2d 1267, 1274 (Miss. 2007), we reiterated: "It is not enough to say (as many do) that summary judgment should be denied because evidence will, or might, be developed later in discovery–or at trial."

19

¶51.    Yet the majority finds this appropriate in this instance based upon language it reads

from *Illinois Central Railroad Co. v. Jackson*, 179 So. 3d, 1043 (Miss. 2015): "To be exact,

the content of summary-judgment evidence must be admissible at trial although the evidence

may be in a form, such as an affidavit, that would not be admissible."

¶52.    But this statement from *Jackson* is actually a *Celotex* illustration.  *See Jackson*, 179

So. 3d at 1043 (citing Jeffrey Jackson, Mississippi Civil Procedure § 11:22 (2009)).  Sworn

affidavits generally are considered hearsay and not admissible at trial as competent evidence;

they are, however, the exception to the requirement that summary judgment be supported or

opposed only by admissible evidence. *See* M.R.C.P. 56(e).  Thus, a properly sworn affidavit,

made on personal knowledge affirmatively showing the affiant is competent to testify to the

matter stated therein, while not admissible, may be enough to defeat summary judgment. *Id*.

*See, e.g.*, *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir.1995) (an

expert-opinion affidavit "may defeat summary judgment if it appears that the affiant is

competent to give an expert opinion and the factual basis for the opinion is stated in the

affidavit"); *but see also In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 187, 193 (2d Cir.

1987) (noting that to defeat summary judgment, expert affidavits cannot involve "mere

speculation or idiosyncratic opinion").

¶53.    I point this out because the majority's view in this case with regard to the California

physician's letter for purposes of Rule 56, appears very similar to the view Tennessee once

held with regard to its own Rule 56.

¶54.    In **Byrd v. Hall**, 847 S.W. 2d 208 (Tenn. 1993), Tennessee began to contemplate that the **Celotex** standard, which most states (including Mississippi) have unified with in their respective Rule 56 practice, was not a good fit for Tennessee's Rule 56 practice.  Then, culminating with **Hannan v. Alltel Publishing Co.**, 270 S.W. 3d 1, 8-9 (Tenn. 2008), the Tennessee Supreme Court explicitly parted ways with the **Celotex** standard, declaring:

> [A] moving party's burden of production in Tennessee differs from the federal burden.  It is not enough for the moving party to challenge the nonmoving party to "put up or shut up" or even to cast doubt on a party's ability to prove an element at trial.
>
> . . .
>
> In summary, in Tennessee, a moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial.

¶55.    But soon thereafter, Tennessee realized it had fallen into a *burning ring of fire* with its newly held standard.[9]  And in **Rye v. Women's Care Center of Memphis**, **MPLLC**, 477 S.W. 3d 235, 264 (Tenn. 2015), the Tennessee Supreme Court parted ways with it, holding: "Because the standard articulated in **Hannan** is unworkable and inconsistent with the history and text of Tennessee Rule 56, we . . . overrule **Hannan**, and fully embrace the standards articulated in the **Celotex** trilogy."

¶56.    Here, whether the California physician's letter was sworn to or not was inconsequential and superfluous to Grand Casinos' actual objection to it.  Grand Casinos' sole concern (and what it did indeed object to) was the substance (or lack thereof) of the

---

[9] Like the majority, I too don't mind borrowing from the great Johnny Cash.

21

letter's "content" being allowed to establish that Dianne's illness was caused by poisonous bacteria contained in a pork chop served by Grand Casinos.

¶57. Again, I fully agree with Grand Casinos. The California physician's letter in no way adequately establishes that Dianne suffered from food poisoning–and much less that the pork chop allegedly consumed by the McGintys was infected by poisonous bacteria.

¶58. As far as this record is concerned, the letter makes no mention of poisonous bacteria, or even food poisoning in general, for a reason. And it is not Grand Casinos' burden to demonstrate why.

¶59. The only mention of bacteria in this case comes from Joe's deposition, in which Joe said he was familiar with the incubation time of certain bacteria, having previously worked in the food industry as a senior vice-president and general manager of operations for McCarty Farms. But Joe–as he admitted–is not a qualified expert in the field of bacteriology.

¶60. I also refuse to take any sort of judicial notice, as the majority and the Court of Appeals appear to do in this case, with regard to the alleged fact the McGintys both became ill *soon* after eating the same pork chop. In addition to the pork chop the McGintys said they ate, the McGintys said they both ate "prime rib" the night before at another casino. And at one point in Joe's deposition, Joe indicated that the prime rib could have caused their illness.

¶61. I point out the case ***Hairston v. Burger King Corp***., 764 So. 2d 176 (La. App. 2nd Cir. 2000). There, it was held that a plaintiff failed to carry her burden of proof that her acute gastroenteritis was the result of food poisoning. Her treating physician testified that none of the tests he conducted revealed any bacteria that could have caused food poisoning; however,

22

he could not rule it out. *Id.* at 178. Notably, the physician also testified that "the incubation for different types of bacteria which can cause food poisoning is anywhere from an hour to a week." *Id*.

¶62. Here, besides the alleged fact that Joe and Dianne became ill at some point after eating the pork chop, the only other evidence presented in support of their claim the pork chop was unfit for human consumption, is Joe's recollection that it "tasted bad." While evidence that food "tasted bad" has been held in some cases to constitute a factor for consideration in determining whether food was unfit for consumption, all of the cases I have reviewed where this was held also contained evidence of medically diagnosed food poisoning by a treating physician. *See, e.g.*, *Smith v. Gerrish*, 256 Mass. 183, 152 N.E. 318 (1926); *Schuler v. Union News Co.*, 295 Mass. 350, 4 N.E.2d 465 (1936).

¶63. In my firm opinion, to reach the conclusion reached by the majority and the Court of Appeals in this case that the collective effect of the evidence presented is enough for a jury reasonably to infer that the McGintys became ill from an infected pork chop, requires bootstrapping inference upon inference from the alleged fact both the McGintys became ill some time after eating the porkchop. I do not read any Mississippi precedent as allowing for this.

¶64. The rule expressed in *Geisness v. Scow Bay Packing Co.*, 16 Wash. 2d 1, 132 P.2d 740, 747 (1942), is universal and sound: "The unwholesome character of food is not established, nor is a prima facie case made, merely by showing that the plaintiff became sick after eating it." *Geisness*, 132 P. 2d at 746 (citing *Poovey v. Int'l Sugar Feed No. 2 Co.*, 191

23

N.C. 722, 133 S.E. 12 (1926); *Gracey v. Waldorf System*, 251 Mass. 76, 146 N.E. 232 (1925)).  Were it otherwise, plaintiffs would be relieved from proving this essential element in virtually any implied-warranty claim involving wholesomeness and fitness of food, which–in effect–would make all restaurants insurers.  *See, e.g.*, *Goodwin*, 42 So. 2d at 404 (warning of the same for negligence actions).

¶65.   For these reasons, I concur in part and dissent in part from the majority's decision in this case.

**WALLER, C.J., JOINS THIS OPINION.**